*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION:  2002 FED App. 0009P (6th Cir.)
File Name:  02a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOSEPH M. POPOVICH,
        *Plaintiff-Appellee/*
        *Cross-Appellant,*

        *v.*

CUYAHOGA COUNTY COURT
OF COMMON PLEAS, Domestic
Relations Division,
        *Defendant-Appellant/*
        *Cross-Appellee,*

CUYAHOGA COUNTY,
        *Defendant-Appellee.*

Nos. 98-4100/4540

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 95-00684—James S. Gallas, Magistrate Judge.

Argued:  June 6, 2001

Decided and Filed:  January 10, 2002

Before:  MARTIN, Chief Judge; MERRITT, RYAN,
BOGGS, NORRIS, SUHRHEINRICH, SILER,
BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY,
and GILMAN, Circuit Judges

1

---

**COUNSEL**

**ARGUED:** Bruce B. Elfvin, ELFVIN & BESSER, Cleveland, Ohio, for Appellants. Richard C. Haber, REMINGER & REMINGER CO., LPA, Cleveland, Ohio, for Appellee. **ON BRIEF:** Bruce B. Elfvin, Barbara Kaye Besser, Amy S. Glesius, for Appellants. Richard C. Haber, Brian D. Sullivan, REMINGER & REMINGER CO., LPA, Cleveland, Ohio, for Appellee. Seth M. Galanter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. Michael Kirkman, Sky Pettey, OHIO LEGAL RIGHTS SERVICE, Columbus, Ohio, Stephen P. Carney, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, Richard N. Coglianese, OFFICE OF THE ATTORNEY GENERAL, EMPLOYMENT LAW SECTION, Columbus, Ohio, Mary M. Collier, ASSISTANT ATTORNEY GENERAL, Nashville, Tennessee, Michael E. Moore, TENNESSEE ATTORNEY GENERAL'S OFFICE, Nashville, Tennessee, for Amici Curiae.

MERRITT, J., delivered the opinion of the court, in which seven of the thirteen judges of the *en banc* court joined in Sections II and III and in the judgment of the court reversing the judgment of the district court and remanding for a new trial; namely, MARTIN, C. J., MERRITT, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN. Six judges, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, would reverse the judgment of the district court and dismiss the case. MARTIN, C. J., MERRITT, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, JJ., concur in Section I of Judge Merritt's opinion for the court. MOORE, J. (pp. 17-22), delivered a separate concurring opinion, in which DAUGHTREY, COLE, CLAY, and GILMAN, JJ., joined. RYAN, J. (pp. 23-38), delivered a separate opinion concurring in part and dissenting in part, in which BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, JJ., joined. GILMAN, J. (pp.

determinative. That action simply set the stage for the hearing on the merits that took place six months later.

Judge Merritt was no longer an active judge when the case was heard en banc (i.e., orally argued, discussed in conference, and tentatively decided) on June 6, 2001. He was therefore ineligible to sit as a member of the en banc court pursuant to the express terms of 28 U.S.C. § 46(c), despite language to the contrary in this court's then-existing I.O.P. 35(a). Expressed another way, our former I.O.P. 35(a) was void because it directly conflicted with the controlling statutory language of § 46(c). *Memphis Planned Parenthood, Inc.*, 175 F.3d at 464. In contrast, both Judge Norris (who took senior status on July 1, 2001) and Judge Suhrheinrich (who took senior status on August 15, 2001) are authorized by the language of § 46(c) to continue participating in this case, because they were both active judges when the matter was heard on June 6, 2001.

I reach this conclusion with great reluctance, both because I recognize that the validity of our former I.O.P. 35(a) has not been previously questioned in this case, and because I agree with the result reached in Judge Merritt's opinion. Nor do I wish to impugn in any way Judge Merritt's integrity or his good faith belief that he is entitled to sit as a member of the en banc court. Based upon my analysis of § 46(c), however, I feel that I have no choice but to voice my disagreement with the composition of the en banc court in this case.

In 1996, § 46(c) was amended to allow a senior judge "to continue to participate in the decision of a case or controversy that was heard or reheard by the court in banc at a time when such judge was in regular active service." 28 U.S.C. § 46(c); Pub. L. No. 104-175, § 1. The legislative history reflects that the 1996 amendment to 28 U.S.C. § 46(c) was proposed in order to resolve the ambiguity of whether a judge on active status when an en banc case is orally argued can continue to participate if he or she takes senior status before the opinion is issued. Senator Simon of Illinois stated the issue as follows: "The bill I introduce today would simply clarify that circuit judges who hear an en banc case as active judges may participate in the ultimate decision of the case even if they take senior status between the time the case is argued and the time it is decided." 141 Cong. Rec. S2133 (daily ed. Feb. 3, 1995). Similarly, Representative Moorehead of California made the following observation:

> [Section 46(c)] has been interpreted to require a circuit judge in regular active service who has heard argument in an en banc case to case [sic, clearly a mistype of "cease"] participating in that case upon taking senior status. This problem leads to uncertainty in deciding who will be eligible to vote on the final disposition of an appeal and may create the perception that a judge is delaying release of an en banc opinion until a member of the en banc court takes senior status.

142 Cong. Rec. H8608 (daily ed. July 29, 1996).

Turning now to the matter at hand, I believe it quite clear that this case was "heard" on June 6, 2001. This was the date of oral argument, the date when the judges of the en banc court retired to discuss the merits following oral argument, and the date when we tentatively voted on the outcome of the case. In contrast, the request for a poll of the active judges in December of 2000 to vacate the ruling of the three-judge panel and consider the case en banc was not outcome-

39-43), delivered a separate opinion concurring in the judgment and dissenting from the composition of the *en banc* court.

---

## OPINION

---

MERRITT, Circuit Judge. The state sovereign immunity provision of the Eleventh Amendment, ratified in 1795 to overrule *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), prohibits Congress from directing the federal courts to hear suits by citizens against a state or its executive, legislative or judicial departments.[1] On the other hand, the Fourteenth Amendment in Section 5, ratified 73 years later, partially abrogates this state immunity from suit in federal courts by giving Congress the "power to enforce [Section 1 of the Amendment] by appropriate legislation," including the creation of federal causes of action against states in federal court.[2] How exactly to reconcile these two conflicting

---

[1] The Eleventh Amendment provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996), gives a brief history of its interpretation.

[2] The pertinent provisions of the Fourteenth Amendment are as follows:

> Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due

provisions has in recent years divided constitutional scholars, the federal courts, and the Supreme Court.[3] This appeal to the *en banc* court asks us to examine further the relationship between these two constitutional amendments. The case arises under *Title II* of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132, which provides that "no qualified individual with a disability shall, by reason of such disability, *be excluded from participation* in or be denied the benefits of the *services*, *programs*, *or activities of a public entity*, or be subjected to discrimination by any such entity" (emphasis added). The statute does not define "excluded from participation" or "discrimination."

Here, a hearing-impaired person brought an action in federal court under Title II against a state court for allegedly failing to provide him with adequate hearing assistance in his child custody case. He obtained a jury verdict in the district court below against the state court for $400,000 in compensatory damages based on an equal protection-type claim of discrimination, a due process-type claim of unreasonable exclusion from participation in the custody proceeding, and a claim of retaliation for filing an administrative complaint for failing to accommodate his disability. The state has asserted it is immune from this suit under the Eleventh Amendment. The questions before us are whether Congress in Title II of the Disabilities Act has validly

---

process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

. . . .

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

[3]Laurence H. Tribe, *American Constitutional Law* § 5-16 (3d ed. 2000); Evan H. Caminker, *Symposium: Shifting The Balance of Power? The Supreme Court, Federalism, and State Sovereign Immunity: "Appropriate" Means-Ends Constraints on Section 5 Powers*, 53 Stan. L. Rev. 1127 (2001).

poll was requested, but who took senior status before the case was orally argued.

The issue as I see it is not whether our I.O.P. controls over § 46(c). I do not believe that anyone seriously contests the principle that an act of Congress prevails over an inconsistent internal rule of court. *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 464 (6th Cir. 1999) ("When a rule of court conflicts with a legislative act, the general rule is that the act controls."). Rather, the only question is whether one can possibly reconcile this court's I.O.P. with the statute by arguing that an en banc case is "heard or reheard" when the poll is requested rather than when the case is orally argued.

For the purpose of this decision, there is no relevant distinction between a case being heard en banc as opposed to being reheard en banc. A case is *heard* en banc in the rare situation when the whole court decides to take up an appeal directly, without the matter first being decided by a three-judge panel. In contrast, a case is *reheard* en banc in situations where the court grants a party's petition for rehearing by the entire court after a three-judge panel has ruled adversely to that party. This case involves the more typical rehearing after a decision by a three-judge panel. For the sake of simplicity and clarity, however, I will confine further discussion to the issue of determining when a case is *heard* en banc. The same conclusion necessarily follows for a case *reheard* en banc.

Turning now to this key issue, I find no support for the proposition that a case is heard en banc when a poll is requested to determine whether the case should be considered by the court as a whole. Polling is a procedural matter, not a decision on the merits of the case. Nor does such a proposition comport with the common understanding of what being "heard" means. Black's Law Dictionary 725 (7th ed. 1999) (defining a "hearing" as "[a] judicial session, usu[ally] open to the public, held for the purpose of deciding issues of fact or of law, sometimes with witnesses testifying.").

banc at a time when such judge was in regular active service.

This court's former I.O.P. 35(a), in contrast, read as follows:

> The en banc Court is composed of all judges in regular active service at the time of a rehearing, any senior judge of the Court who sat on the original panel, *and any judge who was in regular active service at the time a poll was requested on the petition for rehearing en banc . . . .*

(Emphasis added.)

In comparing § 46(c) with this court's then-existing I.O.P. 35(a), one can immediately spot the discrepancy: the I.O.P. allowed a senior status judge to sit on an en banc case if the judge was active when the request for an en banc poll was made, but the statute requires a judge to still be active at the time the case is heard or reheard en banc. Although not controlling in the present case, this discrepancy has been resolved for future cases by this court adopting a new I.O.P. 35(a) on October 31, 2001. The new I.O.P. 35(a) reads as follows:

> The en banc court is composed of (1) all judges in regular active service at the time of oral argument en banc or, if no oral argument en banc is held, on the date that the en banc court agrees to decide the case without oral argument, and (2) any senior judge of the Court who sat on the original panel. Only Sixth Circuit judges in regular active service may cast votes on a poll on the en banc petition itself. See 28 U.S.C. § 46(c).

For the remainder of this opinion, I will be referring to I.O.P. 35(a) as it existed when this case was orally argued on June 6, 2001. Because I.O.P. 35(a) did not conform with § 46(c) until the revised version of the I.O.P. was passed on October 31, 2001, we are left to determine the proper status of one in the position of Judge Merritt who was active when the en banc

abrogated the state court's Eleventh Amendment immunity from suit; and, if so, whether the plaintiff has a valid case under the Act. We conclude that the plaintiff's action is barred by the Eleventh Amendment in so far as the action relies on congressional enforcement of the Equal Protection Clause, but it is not barred in so far as it relies on congressional enforcement of the Due Process Clause. As applied to the plaintiff's cause of action, Title II is "appropriate legislation" under section 5 and the Due Process Clause of section 1 of the Fourteenth Amendment. We also conclude that, on the facts, the $400,000 verdict below must be set aside and the case remanded for a new trial under the Disabilities Act.

## I. Enforcement of The Equal Protection Clause

The original three judge panel in this case agreed with the state's equal protection argument that it was immune from plaintiff's suit under the Eleventh Amendment, and the Court dismissed the suit without reaching the merits. Judge Ryan's opinion for the Court concluded that Congress had improperly expanded the Equal Protection Clause by imposing "heightened scrutiny" in disability cases when it only requires "rational basis" scrutiny. The Court said that "[i]t is well established that disability is not a suspect class for purposes of equal protection analysis" and so "the State may discriminate on the basis of disability if such classification is rationally related to a legitimate state interest." *Popovich v. Cuyahoga County Court of Common Pleas, Domestic Relations Div.*, 227 F.3d 627, 637 (6th Cir. 2000). The panel did not reach any question concerning whether Congress had authority under the Due Process Clause to require accommodation of the disabled in state child custody proceedings.

On December 12, 2000, we elected to rehear this case *en banc*, but delayed consideration until the Supreme Court announced its decision in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S. Ct. 955, decided

February 21, 2001. In June of 2001, the *en banc* court heard oral argument. In *Garrett*, the Supreme Court, 5 to 4, held that the Eleventh Amendment bars federal employment discrimination suits against a state based on disability, as authorized by *Title I* of the Americans with Disabilities Act. The Court, noting that the *Title I* legislation is limited to employment discrimination against the disabled, said that "the scope of the constitutional right at issue" is simply "equal protection." *Id.* at 963. Title I does not encompass claims based on substantive rights under the Due Process Clause, and therefore the scope of the constitutional right Congress is enforcing does not go beyond equal protection liability. The Court then held that Section 5 of the Fourteenth Amendment does not give Congress the power to enforce the Equal Protection Clause by authorizing federal employment discrimination suits against states based purely on *disability*. Like Judge Ryan's opinion for the panel in this case, the Court reasoned that under equal protection principles, disability — unlike race — is not a "suspect category" and does not deserve "heightened scrutiny." Therefore, States may make reasonable employment decisions on the basis of disability. Title I of the Disabilities Act, which addresses discrimination in employment based on disability, may only trigger "minimum rational-basis review," *id.*, and Congress may not enforce the Equal Protection Clause by creating a higher standard of liability and enforcing it against the states in federal court. Sovereign immunity under the Eleventh Amendment forbids heightened state liability in federal courts in disability claims because such claims have never before received more constitutional protection than rational basis review. The Court held that Title I is not "congruent" with the Equal Protection Clause because it greatly expands "discrimination" liability by adding a very large new suspect class of plaintiffs. *Id.* at 967-68. Thus the Supreme Court followed the same line of reasoning constraining congressional enforcement of the Equal Protection Clause as the panel of this Court suggested in its opinion in this case. It is clear after *Garrett* that congressional authority under section 5 to enforce the Equal Protection Clause is limited and

---

## CONCURRING IN PART, DISSENTING IN PART

---

RONALD LEE GILMAN, Circuit Judge, concurring in the judgment, but dissenting from the composition of the en banc court. Although I fully concur in the judgment of the court that upholds the constitutionality of Title II of the Americans with Disabilities Act, I find myself in the unusual and uncomfortable position of having to write separately because I believe that there is a procedural flaw in the composition of the en banc court. Specifically, I am of the opinion that 28 U.S.C. § 46(c) (delineating which judges are eligible to sit on an en banc court) precludes Judge Merritt from participating in this case, despite language to the contrary in the version of this court's Internal Operating Procedure (I.O.P.) 35(a) that existed on the date of oral argument.

The problem arises from the fact that, although Judge Merritt was an "active" judge when the request was made in December of 2000 to rehear this case en banc, he took "senior status" on January 17, 2001. 28 U.S.C. § 371(b)(1) (defining a senior circuit judge as one who is "retired from regular, active service"). Judge Merritt was thus not an active judge at the time this case was orally argued on June 6, 2001, nor was he a member of the original three-judge panel assigned to this matter.

The applicable statute, 28 U.S.C. § 46(c), as amended in 1996, provides in pertinent part as follows:

A court in banc shall consist of all circuit judges in regular active service . . . except that any senior circuit judge of the circuit shall be eligible (1) to participate . . . as a member of an in banc court reviewing a decision of a panel of which such judge was a member, or (2) to continue to participate in the decision of a case or controversy that was heard or reheard by the court in

states contain little evidence directly implicating due process. The Supreme Court has made it very clear that Congress may not, through § 5 "enforcement" legislation, remedy that which it has not identified.

## IV.

In summary, Eleventh Amendment abrogation under Congress's § 5 power is valid only if the legislation is truly enforcing legislation. The Supreme Court's analysis of whether legislation is permissible enforcing legislation turns on the determination of whether the legislation remedies unconstitutional state action, and whether it is tailored to avoid effecting a substantive redefinition of the constitutional right. Title II ventures far beyond the Court's definition of enforcing legislation. First, Congress failed to identify a pattern of state action that violates disabled individuals' due process rights, and, second, Title II of the ADA is not congruent and proportional to any identified state conduct. Therefore, Title II of the ADA is not a constitutionally valid abrogation of state sovereign immunity.

I respectfully dissent.

will not sustain the Disabilities Act as an exception to Eleventh Amendment state immunity.[4]

---

[4]Judge Moore, who concurs in our opinion on due process but not equal protection, states quite clearly in her concurring opinion the problem with upholding Title II on equal protection grounds:

> I recognize that a subset of discriminatory state action may be rational under the Constitution but unreasonable under Title II. In other words, Title II may 'prohibit conduct which is not itself unconstitutional and intrude into legislative spheres of autonomy previously reserved to the states.' *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997)...

But Judge Moore then concludes:

> However, this possibility does not necessarily mean that Title II exceeds Congress's enforcement power under Section 5 of the Fourteenth Amendment. The Supreme Court has instructed that Congress may enact 'reasonably prophylactic legislation' when faced with 'difficult and intractable problems[, which] often require powerful remedies.' *Kimmel v. Florida Bd. of Regents*, 528 U.S. 62, 88 (2000). In enacting the ADA, Congress noted that discrimination against individuals with disabilities was 'a serious and pervasive problem,' 42 U.S.C. § 12101(a)(2).

Judge Moore's position applies to Title II the reasoning of Justice Breyer's dissenting opinion in *Garrett*. But the problem in following this line of argument is that the majority of the Supreme Court in *Garrett* seems to have rejected this position in rejecting Justice Breyer's dissenting viewpoint. Rather, the majority of the Supreme Court appears to have established a clear rule that disability discrimination deserves only rational basis review and that Congress may not go beyond this standard under the Equal Protection Clause by imposing new liabilities on the states. This *Garrett* rule would appear to apply to both Title I and Title II, although the Court has not made this holding explicit as to Title II, and it is possible, though unlikely, that a majority of the Supreme Court might distinguish *Garrett* along the lines Judge Moore proposes in her concurring opinion.

## II.  Title II Appropriately Enforces The Due Process Clause

The Supreme Court indicated, however, that *Title II* of the Disabilities Act is different from Title I.  Although the Court had granted certiorari to consider the appropriateness of Title II as an exception to Eleventh Amendment immunity, the majority in *Garrett* reserved judgment on the validity of Title II under Section 5.  It concluded that Title II, dealing with "services, programs, or activities of a public entity," rather than employment, "has somewhat different remedial provisions from Title I" and is not controlled by the Court's decision restricting equal protection claims against states. *Id.* at 960 n.1.  Title II, unlike Title I, encompasses various due process-type claims with varying standards of liability and is not limited to equal protection claims.  In addition to briefly noting differences between the two titles, the Court in *Garrett* also noted that Section 5 allows Congress to prohibit a "broader swath of conduct" than the courts have themselves identified as unconstitutional. *Id.* at 963.

In *Garrett*, the Supreme Court advised the lower federal courts that "the first step" in reconciling the Eleventh Amendment with legislation adopted under Section 5 is "to identify with some precision the scope of the constitutional right at issue" that Congress is "enforcing," and to define the "metes and bounds" of that particular right." *Id.* at 963-64.  Obviously, standards of constitutional liability differ depending on the nature of the constitutional right in question.  In the case before us, the essential constitutional right sounds most clearly not in equal protection but in due process.  The general claim is that the state court in a child custody proceeding denied the partially deaf plaintiff a reasonable way to participate meaningfully in the proceeding so that he could assert his child custody rights.  He was, he claims, "excluded from participation in" the proceeding — to use the precise words of Title II.  In defining the "metes and bounds" of the constitutional right before us, we must consider whether plaintiff's due process-type claim to participate fully in the

and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520.  Title II fails the congruence and proportionality test.

Title II is an overbroad proscription.  This court has noted on a previous occasion that § 12132 of Title II, which prohibits discrimination against the disabled, "encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998).  Title II prohibits all state conduct that restricts access of the disabled to public services for any reason, without regard to whether the service invokes a constitutional right.  Admittedly, Title II requires only "reasonable accommodation." *Id.* at 571.  And a claimant's recovery under Title II is limited to compensatory damages. *Id.* at 573.  But these limitations are of little comfort.  The Eleventh Amendment does not protect state sovereignty only against relatively large damage awards or subjectively "unreasonable" incursions; it protects the whole of state sovereignty.  By its overbreadth, Title II impermissibly attempts a substantive redefinition of Fourteenth Amendment due process.

A plain reading of Title II demonstrates that even if Congress had before it a pattern of state behavior violative of disabled individuals' due process rights, which it did not, Title II is not sufficiently nuanced to protect that right.  It is beyond question that Congress can protect constitutional rights, but it may not create them.  As the Supreme Court has observed, "[W]e have never held that § 5 precludes Congress from enacting reasonably prophylactic legislation." *Kimel*, 528 U.S. at 88.  But, Title II prohibits much more behavior than is necessary to remedy any state violations of disabled individuals' due process rights.  As the Court held in *Kimel*, "Congress' failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field." *Id.* at 91.  As discussed above, the legislative findings of unconstitutional behavior by the

[D]iscrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services.

*Id.* at § 12101(a)(3). One has to stretch mightily to read this language as an affirmative statement by Congress that it was identifying and remedying *state* action that violated disabled individuals' *due process* rights. This section is a statement of the act's purpose for each of the five titles in the ADA, and it cannot be read to refer to Title II specifically. Furthermore, with the exception of the reference to voting, I do not read in § 12101 the necessary finding by Congress that the disabled suffered violations of their due process rights at the hands of states.

Therefore, whatever might be said for the highly generalized statement of purpose with which Congress elucidated its goal in enacting the ADA, it certainly did not identify a pattern of due process violations.

### 2.

Congress's authority to enact general remedial legislation under § 5 is limited to rectifying conduct that is unconstitutional, not merely undesirable. While Congress determines whether and what legislation is necessary to enforce the guarantees of the Fourteenth Amendment, Congress may not define the bounds of a constitutional violation, *Kimel*, 528 U.S. at 80-81; only the courts may do that. And that is precisely the constitutional flaw in the ADA. The act proscribes too much conduct that is not unconstitutional and thus effects a substantive redefinition of constitutional rights. The ADA's provisions must "be understood 'as responsive to, or designed to prevent, unconstitutional behavior.'" *Florida Prepaid*, 527 U.S. at 639 (quoting *City of Boerne*, 521 U.S. at 532). In the language of the Supreme Court, "There must be a congruence

hearing in his child custody suit is an exception to Eleventh Amendment immunity.

The Supreme Court has recognized the special nature of parental rights and has consequently imposed special due process guarantees so that states may not lightly terminate parents' relationships with their children. The procedural guarantees that the Court has previously had an occasion to discuss include the requirements that states provide indigent parents with court-appointed counsel during certain parental rights hearings, *Lassiter v. Department of Social Servs.*, 452 U.S. 18, 30 (1981) (noting that courts have "generally held that the State must appoint counsel for indigent parents at termination proceedings"); utilize a "clear and convincing" evidentiary standard when considering the termination of parental rights, *Santosky v. Kramer*, 455 U.S. 745, 769-70 (1982); and provide indigent parents, free of charge, with the trial records necessary for proper consideration of appeals challenging termination of their parental authority, *M.L.B. v. S.L.J.*, 519 U.S. 102, 128 (1996). *Cf. Little v. Streater*, 452 U.S. 1 (1981) (striking down Connecticut's requirement that indigent defendants bear the cost of paternity tests if taken at the indigent's request). In fact, although the Court has issued a number of divided opinions in deciding these questions, it has unanimously agreed that "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Santosky*, 455 U.S. at 774 (Rehnquist, J., dissenting).

In *Lassiter*, the Court said that state termination or alteration of parental rights requires procedural safeguards under the Due Process Clause in order to insure "the accuracy and [justice] of the decision," 452 U.S. at 27, and in order to avoid "the risk that a parent will be erroneously deprived of his or her child." *Id.* at 28. Thus the appointment of counsel for indigent parents may be required in complex judicial proceedings that may include the need for "[e]xpert medical and psychiatric testimony, which few parents are equipped to

understand." *Id.* at 30. *Lassiter* makes it clear that in analyzing the safeguards needed in child custody proceedings, the Due Process Clause requires a balancing of "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." *Id.* at 27. This broad balancing standard under due process — unlike the flat rule giving only rational basis analysis under equal protection in disability matters — is open to interpretation by Congress as well as the courts, for otherwise the Court's admonition in *Garrett* that Congress may seek to deter a "broader swath of conduct than the courts have themselves identified as unconstitutional" would have no real meaning or effect. Otherwise the "congruence" required between a piece of Section 5 legislation and the specific constitutional provision enforced by the legislation would mean that Congress may only provide remedies to enforce a specific court decision. This would effectively usurp congressional authority to pass "appropriate" legislation and would give less deference to Congress than courts ordinarily give to administrative agencies in interpreting statutes.

The institutional role of Congress under Section 5 in interpreting the Fourteenth Amendment should be no less expansive than the role of the courts in interpreting statutes at common law. Congress should have at least the same power as Lord Coke described for judges in interpreting statutes in 1628:

> a construction made by the judges, that cases out of the letter of a statute, yet being within the same mischiefe, or cause of the making of the same, shall be within the same remedie that the statute provideth; and the reason hereof is, that for the lawmakers could not possibly set downe all cases in expresse terms.[5]

_____

[5] Sir Edward Coke, The First Part of the Institutes of the Laws of England § 21, at 24.b (Philadelphia, Robert H Small 1853) (1628).

findings, but of unexamined, anecdotal accounts of adverse, disparate treatment by state officials." *Garrett*, 531 U.S. at 370 (internal quotation marks and citation omitted). The notion that the members of Congress relied upon the Task Force *allegations* to determine that the states were engaging in a pattern of due process violations is an unsupportable fiction. Moreover, of the 1,700 or more instances of discrimination identified by the Task Force and listed in Appendix C of Justice Breyer's dissent in *Garrett*, I can locate no more than 35 which arguably raise due process concerns. Of the limited number that could be read to implicate due process—whether it be procedural or substantive due process is another matter—the vast majority are concerned with physical access to polls and courthouses. While I do not doubt that these are serious impediments for the disabled, it is not clear what individual legislators made of these Task Force findings, if indeed they ever heard of them. The best that can be said for them is that they raise equal protection concerns. I have difficulty assigning much credence to the argument that members of Congress relied on Task Force reports which include conclusions such as "state university denied sabbatical proposal of faculty member with disability," *id.* at 410, or "child denied admission to public school because first-grade teacher refused to teach him," *id.* at 420. The intervenor and the majority opinion would have us infer that the individuals' disabilities *caused* the state to act as it did. But, such Task Force "findings" provide legislators with no support for the contention that the states violated disabled individuals' due process rights so routinely as to amount to a pattern of discrimination. Indeed, the findings tell legislators nothing about state actions toward the disabled.

Moreover, the ADA's statement of legislative Findings and Purpose offers no support for the contention that Congress identified a pattern of state due process violations. For instance, 42 U.S.C. § 12101 (expressing the ADA's Findings and Purpose) offers the following, in pertinent part:

individuals have been denied *physical access* to courts, the right to vote, and educational opportunities. But it is quite clear that Congress assessed such evidence of discrimination as denial of equal protection, not denial of due process. For instance, the Committee on Education and Labor found that due to discrimination, the disabled have been denied "the opportunity to compete on an *equal* basis with others . . . ." H.R. Rep. No. 101-485(II), at 29 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 310 (emphasis added). The Committee on the Judiciary wrote that "the goal [of Title II] is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected." H.R. Rep. No. 101-485(III), at 50 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 473 (internal quotation marks, citation, and original alterations omitted). Finally, one of the ADA's sponsors in the House of Representatives stated: "Title II of this act is designed to continue breaking down barriers to the integrated participation of people with disabilities in all aspects of community life." 136 Cong. Rec. E1913, *E1916 (daily ed. May 22, 1990) (statement of Rep. Hoyer).

The court's effort to advance the due process theory at oral argument only confirmed further that the findings Congress had before it sounded in equal protection. After considerable prompting from the bench to shift from an equal protection theory to a due process theory, and then only in response to a question from one of the judges, Popovich's counsel asserted that Congress had made findings that Title II was intended to remedy due process violations. Seizing upon Justice Breyer's dissenting opinion in *Garrett*, counsel invited our attention to Appendix C of the Breyer dissent, which contains a description of the submissions offered to the Task Force on Rights and Empowerment of Americans with Disabilities. *Garrett*, 531 U.S. at 391-424. These are not congressional "findings." They are nothing more than claims of discrimination offered at the many public hearings held by the Task Force, not by Congress. The *Garrett* Court majority noted of Appendix C, that it "consists not of legislative

Judges must adjudicate one case at a time and usually do not go beyond the case at hand to anticipate or rule on other fact patterns that may fall "within the same mischiefe." Law making for future cases with different fact patterns is usually the role of the legislator, not the role of courts in a single decision on a single set of facts after a courtroom battle by adversaries. Therefore, the courts should not tie the hands of Congress under Section 5 merely to the implementation of previous court decisions. Congress should have under Section 5 at least the power that common law judges possess to enforce "the equity of the statute," as described by Lord Coke.[6]

Here the plaintiff's due process interest is significant in that the judicial proceeding will determine the amount of time, if any, he can spend with his daughter. Failure to accommodate his hearing disability may render him unable to participate meaningfully in that determination. If he cannot understand what is happening during the custody hearing, it will be impossible for him to refute claims made against him, or to offer evidence on his own behalf. Consequently, a state's failure to accommodate plaintiff's deafness may greatly increase the risk of error in the proceeding, precluding one side from responding to charges made by the opposing party, an essential element of our adversary system. From Ohio's perspective, the paramount governmental interest is to insure that the State's most vulnerable citizens are placed with the parent best suited for providing for their welfare. This interest is achieved through a proceeding that permits both parents to understand and to respond to the arguments made by their adversaries, thereby giving the judge a complete picture of each parent's abilities to care for the child in question. At the same time, Ohio has an obvious need to administer its decisions in a cost-conscious and time-effective

---

[6] *See* John F. Manning, *Textualism and the Equity of the Statute*, 101 COLUM. L. REV. 1 (2001); William N. Eskridge, Jr., *All About Words: Early Understandings of the "Judicial Power" in Statutory Interpretation, 1776-1806*, 101 COLUM. L. REV. 990 (2001).

manner, and at some point the requested accommodations may become so expensive or onerous as to outweigh their usefulness in reaching a decision.

In legislating on the subject of disability, Congress may require states in child custody proceedings to consider (1) the "vital" and "fundamental" nature of the rights at stake in parental custody hearings, *Santosky*, 455 U.S. at 753, (2) the fact that costs of supplying the requested accommodation are fairly low, and (3) that parties may be virtually "excluded from participation in" the state proceeding unless adjustments are made to accommodate the party's disability. The subject matter involved in the instant case — a father seeking to force the state to provide him with hearing assistance for use in a state judicial proceeding determining his custody rights with respect to his daughter — raises obvious due process concerns which Congress has the authority to address under Section 5. Based on the Supreme Court cases concerning the process required in child custody suits, it is clear that Ohio is required to provide Popovich with some level of hearing assistance, depending on the degree of his disability, for his daughter's custody hearing and may not retaliate against him for making such a request. As applied to the case before us, the "participation" requirement of Title II serves to protect Popovich's due process right to a meaningful hearing. In child custody cases involving hearing-impaired parents, Congress is well within its express authority under Section 5 to require states to accommodate parental disability and to refrain from retaliation, for Congress is "enforcing" the due process right rather than "expanding" it. There is no separation of powers problem here, as in *Garrett*, where Congress, according to the view of the majority, failed to observe a clear rule of equal protection law. Congress has not changed the nature of the due process right or watered down the constitutional standard. The congressional "exclude from participation" standard, as applied here, certainly does not prohibit a "broader swath of [state judicial] conduct" than the Supreme Court suggests is within the congressional power under Section 5.

defining the scope of parents' due process rights does not conclusively determine whether the legislation in question has met the Supreme Court's well-settled criteria for overcoming the Eleventh Amendment. Properly focused on that task, I conclude that it is entirely clear that Congress met neither of the criteria for trumping the Eleventh Amendment: it did not make adequate findings of a pattern of state transgressions and the legislation does not create a congruent and proportional remedy.

### B.

#### 1.

Title II prohibits the exclusion of disabled individuals from participation in the activities of a public entity. 42 U.S.C. § 12132. Neither the language of the statute nor its legislative history give the slightest indication that when creating the statutory right, Congress identified a history or pattern of violations of disabled individuals' *due process* rights. In particular, there is no mention in the statute, either in its statement of legislative purpose or elsewhere, of the rights of disabled parents in the conduct of child custody termination hearings. While Congress made ample findings of "discrimination," almost all of the findings properly sound in equal protection, not due process. I do not question for a moment the fact that disabled individuals in our society have faced severe discrimination and hardship. But, the Supreme Court's Eleventh Amendment jurisprudence requires specific findings of discriminatory *state* action. And those findings must include the conclusion that due process rights, in particular, were violated. The legislative history of Title II supports no such finding.

There is some indication in Title II's legislative history that it was passed in response to discrimination in the provision of public services and accommodations. In an exhaustive examination of the legislative history, the intervenor in this case notes a body of data demonstrating that disabled

### A.

As the Supreme Court stated in *Garrett*, "The first step . . . is to identify with some precision the scope of the constitutional right at issue." 531 U.S. at 365. Here, the constitutional right the majority claims is at issue is the Fourteenth Amendment's due process right. It should be an obvious, however, that analyzing the plaintiff's claim as a due process right, and not an equal protection right, does not *automatically* remedy Title II's Eleventh Amendment violation.

The majority conflates the task of defining the right at issue with the critical step of determining whether the statute is appropriate, remedial legislation. True, due process challenges merit different levels of review depending on the specific due process right enforced. However, the emotionally appealing argument made in the majority opinion that parents have due process rights in termination of custody proceedings does not obviate the need to confront and analyze the constitutional validity of Title II by first examining the Eleventh Amendment jurisprudence handed down by the Supreme Court.

Regardless of the right protected, if Congress wishes to legislatively abrogate the states' constitutional protection afforded by the Eleventh Amendment, it must first identify a history or pattern of state transgression of the *specific right* in question. As a second step, the court must determine whether the remedy is "congruen[t] and proportional[]" to the transgression. *City of Boerne*, 521 U.S. at 520. Casting the argument in terms of parental rights in child custody termination proceedings, the majority opinion finds that the Supreme Court "has unanimously agreed that 'the interest of parents in their relationship with their children is sufficiently *fundamental* to come within the finite class of liberty interests protected by the Fourteenth Amendment.'" Maj. Op. at __ (emphasis added) (quoting *Santosky v. Kramer*, 455 U.S. 745, 774 (1982) (Rehnquist, J., dissenting)). Be that as it may,

### III. The Merits of Plaintiff's Claims under the Disabilities Act

This case, which resulted in a $400,000 damage award for plaintiff, was tried in the district court on three basic theories: (1) retaliation by the state domestic relations court against plaintiff for requesting hearing assistance and then filing an administrative complaint with the Department of Justice under the Disabilities Act in violation of 42 U.S.C. §12203;[7] (2) exclusion from participation in the custody case because of plaintiff's disability; and (3) discrimination against plaintiff by denying him — in the language of the district court's jury charge — "an equal opportunity . . . to enjoy the benefits of a service conducted by the public entity [the state court]" and "the opportunity to participate equally in the proceeding pending before the court." *Popovich v. Cuyahoga County*, No. 98-4100 (N.D. Ohio), charge to jury, April 3, 1998, trial transcript at 770.

We reverse and remand the case for a new trial because the charge to the jury appears to permit the jury to find in favor of

---

[7] 42 U.S.C. § 12203, Prohibition against retaliation and coercion under the ADA, states in relevant part:

(a) Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter, or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

the plaintiff if it finds discrimination against him or exclusion from public proceedings based on equal protection principles. After *Garrett*, this is an impermissible basis on which to base federal jurisdiction under the Eleventh Amendment or a verdict and damages against a state court under the Disabilities Act. *Garrett*, however, does not foreclose a trial and verdict based on retaliation or unreasonable exclusion from judicial proceedings based on disability in a due process-type claim. We believe that the facts presented in the court below raise jury issues on the retaliation and exclusion claims.

The trial in the district court that resulted in the $400,000 damage award consisted of ten witnesses presented over four days. Much of the testimony described plaintiff's custody dispute over his daughter and the initial *ex parte* hearing in August 1992 that led to a state court order transferring custody of his daughter to her mother. This testimony about the custody dispute and the initial *ex parte* hearing is relevant only to the extent that it provides the context or background in which the facts concerning retaliation and exclusion were presented. On the retaliation claim, Mr. Thomas Kondzer, plaintiff's lawyer during the custody dispute and hearings held in 1992, testified that his client was presented with an "option" in December of 1992 by the presiding judge of the custody proceeding that required plaintiff to either give up his rights under the Disabilities Act or suffer a delay in the adjudication of the custody case. Testimony of Thomas Kondzer, Mar. 31, 1998, trial transcript at 173. Mr. Kondzer testified that the waiver "wasn't a waiver for that day. It was a total waiver." *Id.* at 243. According to Mr. Kondzer "the option was to withdraw the motion [for closed-captioning or real time transcription], waive your rights under the ADA and proceed today" or have the proceeding postponed. *Id.* With Mr. Kondzer's advice, the plaintiff refused to waive his Disabilities Act claim or withdraw his motion. After his refusal, the hearing was then discontinued and did not resume again until the fall of 1994, over a year and a half later. In fact, the parties stipulated in the court below that the judge

Amendment is not supported by our case law." *City of Boerne v. Flores*, 521 U.S. 507, 527 (1997). True, "Congress' power 'to enforce' the [Fourteenth] Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81 (2000) (quoting *City of Boerne*, 521 U.S. at 518). But Congress's efforts at remedial legislation cannot impermissibly effect a substantive redefinition of the Fourteenth Amendment. *Id.*

Our primary focus in this case should be whether, in enacting Title II of the ADA, Congress has validly abrogated the states' Eleventh Amendment immunity. The answer is that it has not, and that answer is dictated by the Supreme Court's Eleventh Amendment jurisprudence which must guide our analysis of the issue. As the Supreme Court stated in *City of Boerne*, and most recently developed in *Garrett*, abrogation of Eleventh Amendment immunity under the Fourteenth Amendment's § 5 power is valid only if a court can: (1) identify the scope of the right at issue; and (2) ensure that Congress is truly "enforcing" that right by appropriate legislation. *Garrett*, 531 U.S. at 365-69. A statute is appropriately enforcing legislation under § 5 only if it is truly "remedial." *See Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 638 (1999). "[F]or Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legitimate scheme to remedying or preventing such conduct." *Id.* at 639. In enacting Title II, Congress has not properly invoked § 5 because it has failed to identify conduct transgressing the Fourteenth Amendment's due process right and failed to tailor Title II to carefully remedy such conduct.

understandably surprised counsel. "One need only review the exchange at the *en banc* hearing of this case to know that many 'questions' posed by lawyers, and judges, while phrased in the form of questions are statements." *United States v. Susskind*, 4 F.3d 1400, 1410 (6th Cir. 1993) (*en banc*) (Merritt, J., dissenting). Despite the persistence of some members of the court, counsel for the parties failed to seize upon the due process argument.

## B.

To summarize, the rule in this circuit is that it is not the appellate court's function to craft a party's argument. Absent some pressing concern, skeletal contentions are best left unaddressed. *En banc* proceedings represent an opportunity to clarify disputed matters of law fully vetted via lower court decisions, panel review, and *en banc* briefing. They are not occasions for the advancement of new constitutional theories unexplored by the parties with the attendant risk of confusing important areas of constitutional law. In *Garrett*, the Supreme Court declared: "We are not disposed to decide the constitutional issue whether Title II . . . is appropriate legislation under § 5 of the Fourteenth Amendment when the parties have not favored us with briefing on the statutory question." *Garrett*, 531 U.S. at 360 n.1. This court should abide by that same caution. The parties have not sufficiently presented, and the court has not sufficiently considered, the due process issue; it is for another day.

## III.

Ignoring these compelling reasons for not addressing the due process theory, the majority has chosen to do so and, worse, has reached an erroneous conclusion. Consequently, I, too, must address the substantive merits of that argument.

Congressional efforts to abrogate Eleventh Amendment immunity should proceed mindful of the Supreme Court's admonition that "[a]ny suggestion that Congress has a substantive, non-remedial power under the Fourteenth

presiding over the custody proceeding "gave the plaintiff two options. Plaintiff could withdraw his motion for a hearing accommodation and the court could proceed today, 'with the continued hearing' or [the judge] could, 'schedule a hearing to determine the extent of his hearing disability and what if any accommodation needed to be made for that'." Stipulated Facts of the Parties, Apr. 1, 1998, trial transcript at 390-91. The long delay in the proceedings then ensued.

At a pretrial conference held on February 2, 1995, the new judge assigned to the case presented plaintiff with a proposed stipulated order in which one of the provisions was that plaintiff would agree to waive any objection to or appeal of "this proceeding" and "any prior proceedings on the basis of Joseph Popovich's hearing disability." Def. Ex. B-5; Testimony of Judge Anthony Russo, Apr. 2, 1998, trial transcript at 439. Again, plaintiff, with the advice of his attorney, refused to sign the proposed order.

These facts raise a viable jury issue of retaliation. The jury, based upon these facts, would be entitled to find that forcing Popovich to choose between going forward with the custody hearings and waiving his disability claim — and then upon his refusal to waive, discontinuing the proceedings for a year and a half — could constitute retaliation in violation of § 12203.

These same facts concerning the long delay in the custody case based on plaintiff's refusal to waive his disability claims, plus the claimed refusal of the state court to provide plaintiff with closed captioned translation of the proceeding, or other forms of hearing assistance, may constitute an unreasonable exclusion of plaintiff from participation in the proceeding under principles of due process of law. The case may be retried on both theories of liability under the Disabilities Act.[8]

---

[8] In response to Judge Ryan's dissenting opinion complaining that the *en banc* court should not reach the Due Process Clause theory for upholding Title II, we should point out that until the grant of *en banc*

Hence, the plaintiff's claims based on equal protection type principles of discrimination are foreclosed, as stated above, and the jury verdict of $400,000 is set aside and the case remanded for retrial on the retaliation and unreasonable exclusion from participation claims.

---

rehearing no party had a reasonable opportunity to advance this argument. In the District Court, no party advanced an Eleventh Amendment immunity argument barring this action, and therefore no party was called upon to advance any justification for Title II based on equal protection or due process under Section 5 of the Fourteenth Amendment. Before the original panel, the State as appellant advanced no argument based on the Eleventh Amendment in its original brief and only mentioned in its last reply brief. The State's immunity argument before the original panel was based only on an equal protection argument. The panel accepted the State's equal protection theory and dismissed plaintiff's action even though the State waived any such argument by not raising it in the trial court or in its original brief.

Once the Civil Rights Division of the Justice Department learned that Title II was under constitutional attack before the original panel, it sought to intervene under 28 U.S.C. § 2403(a). Even though § 2403(a) grants the government a right to intervene when the constitutionality of a federal statute is attacked (the Court "shall permit the United States to intervene . . . for argument on the question of constitutionality"), the panel issued a one-line order denying intervention. Thus the panel prevented the government from making any argument and reached its conclusion in the absence of any argument based on the Due Process Clause. The *en banc* court allowed the government to intervene, and it then filed a brief raising the due process justification for upholding Title II in this case. Moreover, Mr. Michael Kirkman of the Ohio Legal Rights Service filed an extensive amicus brief supporting the government's due process justification for Title II. We therefore believe it appropriate to reach the due process basis for upholding Title II. It is not the fault of the *en banc* Court, or the government, that the original panel chose to ignore the Due Process Clause as a basis for Title II.

parties. *Sua sponte* rulings on issues of constitutional import first conjured by the court in its internal deliberations are plainly at odds with our duty to give such issues fully informed and deliberate consideration.

The Supreme Court has demonstrated its allegiance to this prudent approach in declining to decide the very issue before this panel. In *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998), the Supreme Court declined to reach the *fully briefed* argument that Title II of the ADA violates the Eleventh Amendment. As the Court noted, even though the parties had briefed the argument, neither the district court nor the court of appeals had addressed the issue in its opinions and it did not wish to decide such an important matter without the lower courts' views. *Id.* at 212-13. It is a wonder why this court would proceed where the Supreme Court would not.

To be sure, the briefs of the *amicus* and the intervenor presented due process arguments. The *amicus* OLRS advanced due process as one of three grounds for affirmance of the district court's judgment. In its intervenor's brief, the DOJ's due process argument arises as part of its general contention that Congress had before it a large body of evidence showing unconstitutional state action in the provision of public services to the disabled. The DOJ argued that Title II embodies a variety of constitutional rights, including Fourteenth Amendment due process rights. It is difficult to read either of these arguments as sufficiently briefing the difficult and abstruse due process issue the majority has handed to Popovich.

Despite the paucity of due process argument presented in the briefs, at oral argument one or two members of the court made repeated attempts to interest Popovich's counsel in the due process theory he had never advanced. In their "questions," these members attempted to explore a theory of Eleventh Amendment abrogation under a due process theory. They got very little clarification from Popovich's

this body wishes to consider Eleventh Amendment abrogation by the ADA under a due process theory, undoubtedly it will soon have that opportunity. In considering and deciding this case on a "due process theory," the *en banc* court is not "rehearing" anything; it is conducting an original hearing, and even then, on an issue the litigants have not presented.

**2.**

The case precedent in this circuit instructs courts to withhold judgment on issues not fully developed by the briefs or in the record. We have observed:

> "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."

*McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)); *see Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 471 (6th Cir. 2000) (citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)), *cert. denied*, 121 S. Ct. 1355 (2001). Of relevance to what is being done in this case, we cautioned in *United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993), that "it is not our function to craft an appellant's argument." *Id.* at 1080 n.12. We have held that unbriefed issues are considered waived and unreviewable. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996). It is for the parties, not the judges of this court, to raise important constitutional issues for our review, and only when such issues are raised, presented, and decided in the lower court. Our duty to decide such grave questions as the constitutional validity of an Act of Congress is properly discharged only when we have the benefit of a lower court decision, followed by full briefing and argument by the

———————————

**CONCURRENCE**

———————————

KAREN NELSON MOORE, Circuit Judge, concurring. I concur in the judgment of the court and Part II of the majority opinion, but I write separately with respect to Part I. The court relies on the Supreme Court's holding in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), that state employees may not recover money damages for the state's failure to comply with Title I of the Americans with Disabilities Act ("ADA") to foreclose equal protection claims for money damages against the state under Title II of the ADA. I believe that *Garrett* does not control this court's disposition of this case. Moreover, I would conclude, based on the significant differences between Titles I and II, that Congress validly enacted the latter pursuant to its enforcement authority under § 5 of the Fourteenth Amendment to remedy or to prevent violations of both the Due Process and Equal Protection Clauses.

Although classifications based on disability are not subject to heightened scrutiny, the Supreme Court has recognized that the Equal Protection Clause prohibits arbitrary and invidious discrimination against individuals with disabilities. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (holding that "the [disabled], like others, have and retain their substantive constitutional rights in addition to the right to be treated equally by the law"). As correctly noted in Part I of the majority opinion, the Supreme Court held in *Garrett* that Congress had exceeded its § 5 enforcement authority in abrogating state sovereign immunity from suits for money damages under Title I of the ADA. 531 U.S. at 374. In so holding, the *Garrett* Court observed that the legislative record of the ADA "fails to show that Congress did in fact identify a pattern of irrational state discrimination in *employment* against the disabled." *Id.* at 368 (emphasis added). However, the Court expressly reserved the question whether Title II of

the ADA was appropriate legislation under § 5 of the Fourteenth Amendment. *Id.* at 360 n.1.[1] Because *Garrett* did not address whether Congress identified a history and pattern of unconstitutional discrimination by the states against persons with disabilities in *the provision of public services*, I would not read the decision to be determinative in the context of Title II.[2]  Rather than rely on authority that is at best merely implied, I would analyze the constitutionality of Title II on its own merits.

In rejecting the equal protection claim in this case, the court discounts the significant differences between Titles I and II of the ADA. First, Congress made express findings, based on an

---

[1] Indeed, the *Garrett* Court acknowledged that "[t]he overwhelming majority of [the hundreds of accounts compiled by Justice Breyer in his dissent] pertain to alleged discrimination by the States in the provision of public services and public accommodations, which areas are addressed in Titles II and III of the ADA." 531 U.S. at 371 n.7.

[2] *Cf. Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, ___ F.3d ___, 2001 WL 1159970, at *9 (2d Cir. Sept. 26, 2001) (holding that Title II actions for money damages may be brought by plaintiffs who can "establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability"); *see also Thompson v. Colorado*, 258 F.3d 1241, 1249, 1255 (10th Cir. 2001) (stating, post-*Garrett*, that "this court now writes on a clean slate in addressing whether Title II of the ADA is a valid abrogation of the states' Eleventh Amendment immunity" and holding that it is not).
I also find instructive the procedural history of *Dare v. California*, 191 F.3d 1167 (9th Cir. 1999), *cert. denied*, 525 U.S. 819 (2001), in which a divided panel of the Ninth Circuit noted that "Congress made extensive factual findings regarding the widespread arbitrary and invidious discrimination which disabled people face" and held that Congress validly abrogated state sovereign immunity pursuant to its Fourteenth Amendment powers in enacting Title II of the ADA. *Id.* at 1175. The Supreme Court's denial of certiorari in *Dare* came a week after the Court announced *Garrett*.

An en banc hearing or rehearing is *not favored* and ordinarily will not be ordered unless:

   **(1)** en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or

   **(2)** the proceeding involves a question of exceptional importance.

Fed. R. App. P. 35(a) (emphasis added).  This clear language cautions courts to exercise *en banc* review with circumspection.  The Sixth Circuit has expounded further upon this rule:

   A suggestion for rehearing en banc is an *extraordinary procedure* which is intended to bring to the attention of the entire Court *a precedent-setting error of exceptional public importance or an opinion which directly conflicts with prior Supreme Court or Sixth Circuit precedent.*

6th Cir. R. 35(c) (emphasis added).  In the matter before us there is *no* precedent-setting error and there is *no* conflict with prior precedent.  Indeed, in *Garrett*, the Supreme Court affirmed the reasoning of this court's original panel.  That should dispose conclusively of the matter.  The only reason there is any uncertainty in this case is because at oral argument, one or two members of this court manufactured confusion.  The equal protection theory of ADA abrogation—the argument advanced by Popovich—failed. That avenue of reversal foreclosed, the majority gamely conducts an end-run around the precedent and advances its new theory based on due process.  Granted, when deciding *Garrett* the Supreme Court left open the question of Title II and whether it abrogated Eleventh Amendment immunity, but that does not give license to lower courts to reframe appellate issues on rehearing in order to avoid results with which they personally disagree.  The *en banc* panel's effort to create a dispute worthy of reconsideration renders the admonition in Fed. R. App. P. 35 a nullity. *En banc* panels should not create conflicts merely to allow the pronouncement of new law.  If

## II.

It is troubling, to put it mildly, that the strongest advocacy for the theory that the Due Process Clause of the Fourteenth Amendment provides special protection for parents in custody or termination proceedings came from one of the members of the court at oral argument, not the parties, and has now become the basis for the court's judgment in this case.

Since the due process theory is a court-conjured rationale for denying Ohio Eleventh Amendment immunity, it is appropriate to ask whether the court should, upon *en banc* rehearing, address the due process theory of ADA abrogation at all. The members of the court are almost evenly divided on the critically important issue we are deciding: whether, in Title II, Congress has validly overridden the states' Eleventh Amendment immunity. The issue is novel. There is not a single appellate case on point in this circuit or elsewhere. Certainly, there is considerable interest in addressing the majority's novel due process issue, but, in my view, the proper case for doing that is one in which the issue is addressed and decided in the lower court—ours, after all, is a reviewing court—and then fully briefed and argued here. I object strongly to the majority's decision to invent for the plaintiff a theory of recovery he did not raise, brief, or argue, and to which the defendant has not had a suitable opportunity to respond.

This disapproval is not merely a matter of personal preference; it is, as I shall demonstrate, a position well supported by the appellate rules of practice and this court's precedent.

## A.

### 1.

*En banc* proceedings are governed by Fed. R. App. P. 35, which states, in pertinent part:

extensive study and record,[3] of a pattern of unconstitutional discrimination by the states against individuals with disabilities in the areas covered by Title II.[4] These findings appear in the text of the statute itself, where Congress specifically noted that "discrimination against individuals with disabilities persists in such critical areas as . . . education . . . institutionalization . . . voting, and access to public services." 42 U.S.C. § 12101(a)(3). The findings also appear in the legislative history of Title II. H.R. REP. NO. 101-485, pt. 2, at 28-29 (1990); S. REP. NO. 101-116, at 6 (1989).[5]

---

[3] Congress itself held no less than thirteen hearings; it also created the Task Force on the Rights and Empowerment of Americans with Disabilities ("Task Force"), which held sixty-three public forums in every state that were attended by thousands of people. *Garrett*, 531 U.S. at 377-78 (Breyer, J., dissenting). The Task Force eventually submitted "several thousand documents" that evidenced "massive discrimination and segregation in all aspects of life" and "the most extreme isolation, unemployment, poverty, psychological abuse and physical deprivation experienced by any segment of our society." 2 STAFF OF HOUSE COMM. ON EDUC. AND LABOR, 101ST CONG., LEGISLATIVE HISTORY OF PUB. L. NO. 101-336: THE AMERICANS WITH DISABILITIES ACT 1324-25 (Comm. Print 1990) ("2 LEGIS. HIST.").

[4] In contrast, the *Garrett* Court emphasized that Congress had mentioned the private sector — but not the states — in its legislative findings about employment discrimination against persons with disabilities. 531 U.S. at 371-72.

[5] Furthermore, the caselaw contains some evidence of "extensive litigation and discussion of the constitutional violations," *Garrett*, 531 U.S. at 376 (Kennedy, J., concurring), in the provision of public services to the disabled. *See, e.g., Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1243, 1248 (6th Cir. 1989) (fifteen paraplegics received "deplorable treatment" at a county jail — they were not bathed for several days and forced to remain in their human waste), *cert. denied*, 495 U.S. 932 (1990); *Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia*, 874 F.2d 156, 158 (3d Cir. 1989) (city and state did not violate the Fourteenth Amendment in reducing or eliminating services to mentally retarded persons living at home); *LaFaut v. Smith*, 834 F.2d 389, 392-94 (4th Cir. 1987) (paraplegic inmate was denied adequate toilet facilities for three months and necessary physical therapy); *Gallagher v.*

The fact that Title II implicates constitutional violations in areas ranging from education to voting also suggests that heightened judicial scrutiny under both the Due Process and Equal Protection Clauses is appropriate. Title II's general mandate covers all "of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. In this case, which involves the right of a hearing-impaired person to have adequate hearing assistance in a child custody proceeding, the court concludes that "the essential constitutional right sounds most clearly not in equal protection but in due process." Maj. op. at 8. However, in finding widespread unconstitutional discrimination against persons with disabilities, Congress heard extensive testimony not only about the states' failure to make courtrooms accessible to all persons but also about the states' discrimination against the disabled in areas such as

---

*Pontiac Sch. Dist.*, 807 F.2d 75, 78-79 (6th Cir. 1986) (schools did not violate the Fourteenth Amendment by failing to provide "*additional special services*" to a deaf and mentally handicapped student who was enrolled in special education programs); *Parrish v. Johnson*, 800 F.2d 600, 603, 605 (6th Cir. 1986) (prison guard repeatedly assaulted two paraplegic inmates with a knife, caused them to sit in their own feces, and taunted them with remarks like "crippled bastard"); *cf. Pushkin v. Regents of Univ. of Colorado*, 658 F.2d 1372, 1376 (10th Cir. 1981) (doctor alleged that state university excluded him from its Psychiatric Residency Program in violation of the Rehabilitation Act because he suffered from multiple sclerosis).

*v. Olson*, 487 U.S. 654, 677 (1988), we rested our decision on the equal protection argument.

We held that equal protection was not a constitutionally sufficient basis on which to rest the ADA's abrogation of Eleventh Amendment immunity, reasoning that since government classifications involving disabled individuals receive rational review, the ADA prohibited a much broader swath of conduct than did the Fourteenth Amendment's Equal Protection Clause. The equal protection reasoning of our decision was ultimately approved and adopted by the Supreme Court in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), in which the Court held that Congress did not validly abrogate states' Eleventh Amendment immunity when it passed Title I of the ADA.

Popovich moved for rehearing and a majority of this court's active members agreed to rehear the case *en banc*. In the interim, the Department of Justice intervened on behalf of Popovich and an *amicus* brief was submitted on his behalf by the Ohio Legal Rights Service (OLRS). Oddly, by the time the petition for rehearing *en banc* was granted, a new ADA theory was being advanced, not by Popovich, but by the *amicus* and the intervenor. Later, at the *en banc* hearing, some members of the court inquired of counsel concerning the novel and unbriefed "due process-type" theory, even though the parties had not argued it. As a result, much of the argument before the *en banc* court differed markedly from the equal protection theory the parties had briefed and argued before the original panel and had again briefed and attempted to argue before the *en banc* court. Nevertheless, at what surely will come as a surprise to the parties, the majority, unbidden, save for the urging of an *amicus* and an intervenor, finds that it is through enforcement of the Due Process Clause of the Fourteenth Amendment, and not, as the parties thought, the Equal Protection Clause, that Congress has successfully abrogated the states' Eleventh Amendment immunity.

combination of a temporary restraining order against Popovich on motion by his ex-wife, a referee's illness, motions regarding Popovich's hearing accommodation, and unexplained scheduling delays.

Following a jury trial, Popovich was awarded $400,000 in compensatory damages. The DRD filed post-trial motions, which, with one exception, were rejected. The DRD then appealed to this court.

In its appeal, the DRD advanced arguments based on judicial immunity and the insufficiency of the lower court's findings. Popovich responded to each of those arguments in turn. Only in the DRD's reply brief was the issue of its Eleventh Amendment immunity raised. In light of the obvious importance of the Eleventh Amendment issue and the split in circuit authority, the panelists thought this abbreviated, afterthought reference to the Eleventh Amendment immunity defense was troublesome, particularly since the principle of state sovereignty that the Eleventh Amendment codifies directs us to consider carefully legislative actions that curb its protections. To assist our effort to reach an informed decision on the matter and provide the parties a fair hearing, we, the original panelists, directed the parties to submit letter briefs specifically addressing Eleventh Amendment immunity and the ADA. We did so after satisfying ourselves that it is well settled that Eleventh Amendment state sovereign immunity could properly be raised for the first time on appeal. *Popovich v. Cuyahoga County*, 227 F.3d 627, 631-33 (6th Cir. 2000).

The parties argued that Congress's abrogation of Eleventh Amendment immunity rested on congressional protection of the Fourteenth Amendment's equal protection principle. Neither party suggested that Congress acted to enforce any due process protection. In light of the argument before the court, and mindful that federal courts are forbidden to issue advisory opinions, U.S. Const. art. III, § 2, cl. 1; *see Morrison*

voting[6] and education,[7] which clearly implicate the Equal Protection Clause.

Finally, I believe, given the extensive record of constitutional violations in the states' provision of public services to persons with disabilities, that Title II is a more congruent and proportional remedy than Title I. Although Title II does require the states to take some affirmative steps to ensure that the disabled have access to governmental programs, it targets discrimination that is unreasonable. Title II requires reasonable modifications only when a disabled individual is otherwise eligible for a public service and the modifications would not fundamentally alter the nature of the service. The states therefore maintain their discretion over the provision of public services so long as they do not arbitrarily discriminate against the disabled. I recognize that a subset of discriminatory state action may be rational under the Constitution but unreasonable under Title II. In other words, Title II may "prohibit[] conduct which is not itself unconstitutional and intrude[] into 'legislative spheres of autonomy previously reserved to the States.'" *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)). However, this possibility does not necessarily mean that Title II exceeds Congress's enforcement power under § 5 of the Fourteenth Amendment.

---

[6] *See, e.g.*, S. REP. NO. 101-116, at 12 (citing testimony about state discrimination in making polling places accessible to the disabled and forcing votes by absentee ballot before candidates participated in key debates); 2 LEGIS. HIST. 1219-20 (the chairperson of the Rhode Island Governor's Commission on the Handicapped testified about impediments to a disabled individual's ability to register as a voter and to vote).

[7] *See, e.g.*, S. REP. NO. 101-116, at 7 (finding illustrative the testimony of a paraplegic who "was promptly refused admission [to the local public school] because the principal ruled that [she] was a fire hazard" due to her wheelchair); 2 LEGIS. HIST. 1224 (a legally blind student at the State University of New York "had to drop a required theory course because [she] was unable to read the photo-reduced score of a Bach cantata").

The Supreme Court has instructed that Congress may enact "reasonably prophylactic legislation" when faced with "[d]ifficult and intractable problems[, which] often require powerful remedies." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 88 (2000). In enacting the ADA, Congress noted that discrimination against individuals with disabilities was "a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). The record indicates that the states have discriminated against the disabled in many aspects of governmental operations and that they may continue to do so. Confronted with this record of unconstitutional treatment, I conclude that the accommodations that Title II requires are necessary to fulfill Congress's purpose "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

For the foregoing reasons, I would hold that the Eleventh Amendment does not bar Title II actions for money damages against the states based on violations of the Equal Protection Clause.

---

## CONCURRING IN PART, DISSENTING IN PART

---

RYAN, Circuit Judge, concurring in part, and dissenting in part. I concur entirely in the majority's conclusion that Congress did not validly abrogate the states' Eleventh Amendment immunity when, under Title II of the ADA, it attempted to enforce the Equal Protection Clause. But, as I shall explain, I strongly disagree that, in enacting Title II, Congress validly abrogated states' immunity from alleged due process violations of the kind plaintiff has brought. Just as Congress did not validly exercise its constitutional authority under § 5 of the Fourteenth Amendment when it sought, in Title II, to override states' Eleventh Amendment immunity from equal protection claims, it likewise failed to do so with respect to due process claims.

### I.

Joseph M. Popovich filed a complaint in 1995 alleging that the Domestic Relations Division of the Cuyahoga County Court of Common Pleas (DRD) discriminated against him in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134. Popovich also argued that the DRD retaliated against him after he filed a discrimination charge against the court with the United States Department of Justice.

Popovich, who suffers from partial hearing loss, claimed that the DRD violated Title II when it refused to provide him with real-time captioning services during custody hearings concerning his daughter. He further claimed that the DRD's effort to accommodate him by providing an FM amplification system was not reasonable because the system's headphones had given him an ear infection. Popovich also complained of numerous procedural delays which caused the hearings to drag on over four years. The delays were caused by the