LYNCH, Circuit Judge.
This difficult case involves subtle questions of doctrine and important principles of sovereignty and federalism. It centers on allegations of a series of actions by corrections officers employed by the state of New Hampshire, which, if they occurred and were not adequately justified, violated the constitutional and statutory rights of Matthew Kiman. Kiman is a former pris *15 oner of the state who suffers from the degenerative and terminal illness known as Lou Gehrig’s Disease. Kiman alleges that although the state knew of his disease, he was deprived of a cane to walk with and a chair to sit on in the shower, that his hands were improperly cuffed so as to cause him pain, and that he was made to stand in lines and climb stairs despite the illness that made it painful for him to do so. He also alleges that he was denied a toilet suitable for his use and that his guards did not give him the medications prescribed by his doctors. He says that because of such treatment, his health has deteriorated faster than it otherwise would have.
Kiman sought damages for his injuries under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12165 (1994), and under state law. The district court dismissed his suit against the New Hampshire Department of Corrections, reasoning that under Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), Kiman could not sue the state. Kiman v. N.H. Dep’t of Corr., No. 01-134-B, 2001 WL 1636431 (D.N.H. Dec. 19, 2001). After considering the complex legal issues presented, we hold that Title II of the ADA as applied to the facts of this case abrogates the sovereign immunity of New Hampshire, and we reverse and remand.
I.

A. Facts

When a district court dismisses a case on the pleadings because a state claims immunity under the Eleventh Amendment (or the broader principles that provision embodies) it must take the factual allegations of the plaintiffs complaint as true. Neo Gen Screening, Inc. v. New England Newborn Screening Program, 187 F.3d 24, 25 (1st Cir.1999). With this in mind, we describe the facts Kiman has alleged.
Matthew Kiman is a former inmate of the State of New Hampshire Department of Corrections who has amyotrophic lateral sclerosis (ALS), a condition also known as Lou Gehrig’s Disease. ALS causes certain nerve cells in the brain and spinal cord to degenerate. Its victims gradually lose the ability to control their voluntary muscles, a process that causes the muscles to atrophy and that eventually leads to total paralysis and death. See generally Understanding ALS: What is ALS?, at http://www.alsa.org/als/whatis.cfm (last visited July 25, 2002). Kiman’s symptoms began to show in April 1998 or earlier, but he was not diagnosed until January 1999. The record does not show the exact dates of his imprisonment, but he' suffered from and was diagnosed with the disease during the imprisonment. His counsel stated at oral argument that he has been released from the Department of Corrections, so that injunctive relief is no longer of any use, and that since the events giving rise to this case his condition has continued to deteriorate.
Kiman says that the Department of Corrections denied a number of requested accommodations for his disability, which he says could easily have been made, and that the denial caused him considerable suffering, which accelerated the progress of his disease. Although he requires a cane to walk, the prison refused to provide one for his daily exercise. Although he said he experienced pain when his hands were cuffed behind his back, his guards continued to do so, refusing to cuff his hands in front of his body instead. Although he was unable to stand while taking a shower, and although he says a chair was ordered for him (he does not specify by whom), his guards refused to provide one, which re *16 peatedly caused him to fall. Although he was unable to stand for extended periods, he was required, like other inmates, to wait in long lines for food. Although he was unable to climb stairs, he was placed in a cell on the “third tier,” which we take to mean the third floor, of the prison. Although he was unable to use a standard toilet, the Department failed to provide an accessible one, forcing him to rely on his cellmates for assistance with personal hygiene. Kiman further says that the Department negligently delayed giving him medical attention, and that because of the delay he was diagnosed later than he should have been; and that his guards at times both negligently and maliciously withheld his prescription medications.

B. History

In April 1999, Kiman filed a charge against the Department of Corrections with the New Hampshire Human Rights Commission. By then, he had been released. The Commission informed him in May 1999 that it lacked jurisdiction over Title II of the ADA, and referred him to the federal Department of Justice. Ki-man’s counsel then engaged in a lengthy correspondence with that Department’s Civil Rights Division that lasted from May 1999 to October 2000, during which time the Division took no action. Finally, Ki-man resorted to federal court.
On April 16, 2001, Kiman filed suit in the District of New Hampshire. He named as defendants the Department of Corrections and thirteen of its officers and employees, each in his or her official and individual capacities. He alleged violations of Title II of the ADA and several state law claims, and sought compensatory and punitive damages.
The defendants moved to dismiss, arguing, first, that Kiman had stated no claim under Title II because Congress exceeded its power under section five of the Fourteenth Amendment when it purported to abrogate the states’ Eleventh Amendment immunity in Title II of the ADA; second, that Title II does not provide a cause of action against state officers in their individual capacities (and that in any event Kiman had failed to state a claim against the official defendants in their individual capacities); and third, that their first two arguments eliminated all of Kiman’s federal causes of action, and that the court should decline to exercise supplemental jurisdiction over Kiman’s claims. Kiman responded primarily by defending Congress’s exercise of its section five power through the ADA.
On December 19, the district court issued a three-page order granting the defendants’ motion to dismiss. Kiman, 2001 WL 1636431. It noted the Supreme Court’s recent holding in Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866, that Congress failed to abrogate the states’ immunity in Title I of the ADA. Kiman, 2001 WL 1636431, at *1. It then said that it would follow Reickenbacker v. Foster, 274 F.3d 974 (5th Cir.2001); Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2d Cir.2001); and Thompson v. Colorado, 258 F.3d 1241 (10th Cir.), amended by 278 F.3d 1020 (10th Cir.2001), cert. denied, - U.S. -, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002), in concluding that Congress failed to abrogate the states’ immunity in Title II of the statute. Kiman, 2001 WL 1636431, at *1. The court acknowledged the Second Circuit’s holding in Garcia that the ADA’s abrogation of immunity in Title II is effective as applied to cases in which a private plaintiff alleges discrimination based solely on ill will or animus. Id. at *1 n. 1 (citing Garcia, 280 F.3d at 111). The court said, however, that Kiman “does not allege that he was the victim of intentional discrimination,” *17 and so it would not reach the question of whether the Second Circuit’s analysis was correct. Id. The court did not address the defendants’ arguments regarding the official defendants in their individual capacities,[1] but did decline to exercise supplemental jurisdiction over Kiman’s state law claims. In any event, it dismissed the entire case. Id. at *1.
On appeal, Kiman challenges the district court’s Eleventh Amendment ruling. He renews his argument that Title II of the ADA was a valid exercise of Congress’s power under section five of the Fourteenth Amendment. The United States has intervened to defend the constitutionality of the statute, and has filed a brief discussing the evidence on which Congress relied to make the legislative findings that support Title II. The Department of Corrections asks us to affirm the district court’s order, arguing in essence that Garrett dictates the outcome in this case.
II.
We review the judgment of a district court granting a motion to dismiss on the basis of a state’s Eleventh Amendment immunity de novo. Mills v. Maine, 118 F.3d 37, 41 (1st Cir.1997).

A. Background

This case arises in the rapidly changing landscape of the Supreme Court’s recent jurisprudence regarding the states’ immunity from suit by private parties under federal law.[2] The changes began in 1996, when the Supreme Court in Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), overruled its prior case of Pennsylvania v. Union Gas Co., 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), and held that Congress may not subject states to private suits by means of legislation enacted under its Article I powers. The Court erased any doubt that the rule of Seminole Tribe extended beyond the congressional power over commerce in Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999), which reaffirmed Seminole Tribe and applied it to the Patent Clause.
The Court has, however, preserved the rule of Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), that Congress may subject the states to private suit by means of legislation enacted under section five of the Fourteenth Amendment. Garrett, 531 U.S. at 364; Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 80, 120 S.Ct. 631, *18 145 L.Ed.2d 522 (2000). That is because the Fourteenth Amendment changed the relation between the federal and state governments, and section five represents a grant of power to Congress to enforce the new order. Fitzpatrick, 427 U.S. at 455-56. Nevertheless, it is fair to say that the Court’s recent cases have sharply scrutinized congressional exercises of the section five power, beginning with City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In that case, the Court held that Congress may not define new rights under the Fourteenth Amendment, but instead must enforce rights granted by the Amendment itself, id. at 519; moreover, congressionally created remedies for existing rights must be congruent and proportional to identified violations of those rights, id. at 533-34.
When Congress attempts to subject the states to private suit using its section five power, these limitations bind tightly. In Florida Prepaid, the Court held that Congress had exceeded its section five power in the Patent and Plant Variety Protection Remedy Clarification Act, 35 U.S.C. §§ 271(h), 296(a) (1994). Although some state violations of individuals’ patent rights do violate the Fourteenth Amendment’s Due Process Clause, Florida Prepaid, 527 U.S. at 642, the Court held that in passing that Act Congress had identified no pattern of unconstitutional patent infringement by the states. Id. at 640-41. Similarly, in Kimel, the Court held that most of the conduct by a state prohibited by the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 (2000), was not unconstitutional, and that Congress had identified no pattern of unconstitutional age discrimination that- could justify the Act’s broad prohibitions as a remedial or prophylactic measure. Kimel, 528 U.S. at 82-91.
Most recently, in Garrett, the Court held that Congress exceeded the limits of section five when it purported, in Title I of the ADA, 42 U.S.C. §§ 12111-12117 (1994), to abrogate the states’ immunity from private suit. Citing City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Court explained that the Equal Protection Clause prohibits state action that disadvantages individuals with disabilities only when that action lacks any rational basis. Even though an action may be motivated in part by irrationally negative attitudes toward those with disabilities, it does not deny equal protection so long as there is some legitimate basis on which the state’s action may be justified. Garrett, 531 U.S. at 366-68. The Court rejected as insufficient the lengthy legislative record of discrimination against, and neglect of, those with disabilities, for several reasons: because that record did not deal with the acts of states nearly so often as with those of municipal and local governments (which do not possess Eleventh Amendment immunity), id. at 368-69; because it was difficult to determine whether the acts in question violated the Constitution, or merely the ADA’s own requirements, id. at 370; because Congress had made no express legislative finding of a pattern of unconstitutional state action in employment, id. at 371; and because in any event the ADA’s requirements extended far beyond those of the Constitution and so could not be congruent and proportional to any pattern of discrimination that Congress might have reasonably identified from the record, id. at 372-73.
The Garrett Court reserved the question, however, of whether Congress in passing Title II might have succeeded where it failed in passing Title I. Id. at 360 n. 1. Title I deals with employment, private and public, but Title II is directed entirely *19 to public services.[3] Indeed, the Court relied on the distinction between Title I and Title II: the Court observed that Congress’s legislative findings spoke to private employment, and to public accommodations and services, but not to public employment, id. at 371; and the Court said the same of the legislative record that Congress compiled, id. at 371 n. 7.
In the aftermath of Garrett, various states have challenged Title II’s abrogation of immunity. The Fifth and Tenth Circuits have held that Title II in its entirety suffers from the same fatal defects as does Title I, so that the states remain immune from suits under Title II. Reickenbacker, 274 F.3d at 981-83; Thompson, 278 F.3d at 1034. In contrast, the Ninth Circuit has adhered to its holding in a case preceding Garrett that Title II is an effective exercise of Congress’s section five power. Hason v. Med. Bd., 279 F.3d 1167, 1170-71 (9th Cir.2002) (reaffirming Dare v. California, 191 F.3d 1167, 1173-76 (1999), cert. denied, 531 U.S. 1190, 121 S.Ct. 1187, 149 L.Ed.2d 103 (2001)).
The Second and Sixth Circuits have held, in different formulations of a similar idea, that Title II abrogates state immunity from private suit in some cases but not in others. Garcia, 280 F.3d at 111 (holding that Title II validly authorizes a private suit against the state when, but only when, a “Title II violation was motivated by discriminatory animus or ill will based on the plaintiffs disability”); Popovich v. Cuyahoga County Court of Common Pleas, 276 F.3d 808 (6th Cir.2002) (en banc) (holding that Title II does not abrogate immunity as enforcement of the Equal Protection Clause, but does abrogate immunity on specific facts as enforcement of the Due Process Clause), petitions for cert. filed, 70 U.S.L.W. 3656 (U.S. Apr. 8 and 10, 2002) (Nos.01-1503, 01-1517). Our approach today is closest to this middle path. Given the facts of this case, we do not find it necessary to identify which applications, if any, of Title II may fail to authorize private suits against the states.

B. The Eleventh Amendment and as-applied challenges

Much legislation in which Congress invokes its section five power will prohibit at least some state action that is clearly unconstitutional under established judicial definitions of the Fourteenth Amendment — and for which Congress could therefore at least potentially provide a private action against the state. Title II of the ADA, for example, would prohibit the restrictive zoning practice that the Supreme Court held unconstitutional in City of Cleburne. In such cases, of which this is one, Congress may be viewed as simply providing remedies where the judiciary has already found a set of facts to violate the Constitution.
In other cases, as the Court has said repeatedly, Congress may enact valid enforcement legislation that prohibits conduct not in itself unconstitutional. The Court has recently used the Voting Rights Act as an example of permissible legislation enforcing the Fifteenth Amendment. Garrett, 531 U.S. at 373 (discussing South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), which upheld that Act). When Congress does so, however, its enactment must survive judicial scrutiny more rigorous than that which the courts apply when Congress simply provides a remedy. See City of Boerne, 521 U.S. at 519-20 (“While the line between measures that remedy or prevent unconstitutional actions and measures that *20 make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There.must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.”).
Generally, a court will not strike down a statute as unconstitutional unless it is convinced that the statute is unconstitutional on the facts of a specific case, that is, as applied to the party that argues for unconstitutionality. See United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) (“[O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.”).
In some areas of the law, a party may sometimes argue for a statute’s unconstitutionality even though, as a matter of doctrine, the party’s own interests in the specific case are not directly protected by the Constitution. That argument is a facial challenge, as distinct from a challenge to the statute as applied. The most well-known examples occur in the context of the First Amendment, in the doctrines of overbreadth and vagueness. There, a speaker whose own speech is unprotected (because, for example, it is obscene) may nevertheless escape prosecution for that speech based on an argument that the statute would also apply to protected speech, or is so unclear as to chill protected speech. See Broadrick v. Oklahoma, 413 U.S. 601, 611-15, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); see also City of Chicago v. Morales, 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion) (discussing facial challenges to statutes based on constitutional provisions other than the First Amendment). See generally R. Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L.Rev. 1321 (2000) (analyzing the precedent and theory of facial challenges).
This case presents the question of whether New Hampshire may assert its Eleventh Amendment immunity against a suit under Title II alleging conduct by the state’s agents that, if it occurred and was not adequately justified, violated the Constitution,[4] based on the argument that Title II also subjects the state to private suit for conduct not required by the Constitution, and arguably not within Congress’s section five power. The Supreme Court has not yet said whether the Eleventh Amendment, with its associated principle of state sovereign immunity, is among the constitutional doctrines that necessarily require a particular congressional enactment to be either wholly constitutional or wholly unconstitutional.[5] We conclude that the concerns that justify facial challenges are not present in this area of the law, and we view this case as a challenge to Title II as applied.
A review of the Court’s precedent supports our conclusion that this question is as yet unanswered. In Seminole Tribe, the question presented to the Court was *21 purely one based on Congress’s ability to regulate commerce “with the Indian Tribes,” U.S. Const. art. I, § 8, cl. 3; there was no argument to be made that the Indian Gaming Regulatory Act enforced the Fourteenth Amendment, even in part. 517 U.S. at 60. In Florida Prepaid, the Court said nothing about the possibility of upholding the Patent Remedy Act as applied, although Justice Stevens in dissent argued that the statute could and should be so upheld. 527 U.S. at 653-54 (Stevens, J., dissenting). On the majority’s view of the case, however, the Court’s holding that even a state’s patent infringement violates due process only if the state provides no state law remedy to the injured patent holder meant that no constitutional violation had in fact occurred. Florida Prepaid, 527 U.S. at 643; see also id. at 644 n. 9 (noting that Florida does in fact provide such a remedy). In the companion case of College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), the Court’s section five analysis began and ended with its conclusion that trademark rights were not property rights, at least within the context of the Fourteenth Amendment. Id. at 672-75. Therefore, the challenged statute involved no constitutional violations. In Kimel, which involved three separate cases, consolidated by the Eleventh Circuit, the Court did not go into detail regarding the facts of the plaintiffs’ cases. The facts it did recite do not include any specific mention of irrational actions by the state defendants that would have violated the Equal Protection Clause. See 528 U.S. at 69-70. Finally, in Garrett, the Court’s description of the facts leaves little doubt that the Constitution was not violated by the actions of Alabama in that case. See 531 U.S. at 362 (describing the refusal of the University of Alabama to allow a Director of Nursing to take leave while she underwent chemotherapy, and that of the Alabama Department of Youth Services either to modify a security officer’s duties -to permit him to avoid carbon monoxide, or to allow him to work daytime shifts).
Moreover, Garrett implies that the Court’s recent sovereign immunity jurisprudence is consistent with a step-by-step, as-applied analysis of congressional power to authorize private suits against the states, where the facts of the statutory claim also make out a constitutional one. The Court chose to address only Title I, and to dismiss the writ of certiorari to the extent it covered Title II. 531 U.S. at 360 n. 1. To some extent, of course, this suggests merely that the Court found the provisions of Title II, as they purport to authorize a suit against the states, severa-ble from those of Title I. The same abrogation provision, however, applies to both Title I and Title II — indeed, to the entire ADA. See 42 U.S.C. § 12202. It thus requires no great leap from the Court’s position in Garrett to separate out, within Title II, cases that involve constitutional violations from those that do not, as we do today. See Fallon, supra, at 1331 (discussing the links between the concept of statutory severability and the preference for as-applied adjudication). This circuit’s precedent in Eleventh Amendment cases follows the Court’s approach in Garrett. See Laro v. New Hampshire, 259 F.3d 1, 9 & n. 6 (1st Cir.2001) (considering whether Congress could subject the states to private suit under one provision of the Family and Medical Leave Act, without reaching the question as to the other provisions).
Nor are broadly available facial challenges in Eleventh Amendment and state sovereign immunity cases (where the facts pled amount to a constitutional violation) necessary to preserve the states’ interests in those cases. There is no question in *22 American constitutional law that two principles constrain Congress’s ability to authorize private suits against the states as sovereigns: the states’ interest as sovereigns in avoiding suits to which they do not consent, and the states’ financial interest in controlling disbursement from their own treasuries. See Fed. Mar. Comm’n v. S.C. State Ports Auth., — U.S. -, -, 122 S.Ct. 1864, 1874, 152 L.Ed.2d 962 (2002) (“The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities.”); id. at 1877 (noting that “state sovereign immunity [also] serves the important function of shielding state treasuries and thus preserving ‘the States’ ability to govern in accordance with the will of their citizens’ ”) (quoting Alden v. Maine, 527 U.S. 706, 750-51, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)).
In a case that involves a constitutional violation, a given suit places no greater burden on a state’s dignity or fisc if the challenged statute also authorizes suits in other cases. In areas where facial challenges are permitted, by contrast, it is often because the particular activity protected by the Constitution — such as the freedom of speech or the right to an abortion — is particularly vulnerable to statutes that discourage without clearly prohibiting its exercise. Broadrick, 413 U.S. at 612; see Morales, 527 U.S. at 55 (plurality opinion) (citing Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 82-83, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)). But the states are familiar with the requirements of constitutional law, and the Eleventh Amendment is concerned not with making room for allegedly illegal state conduct but instead with insulating the states from private suit. Thus, there is no affront to protected dignity or fiscal interests from requiring the states to appear and defend their conduct when Congress has provided the remedy of a private suit for a specific constitutional violation. Without such concerns- at stake, we follow the traditional approach of taking small steps and considering separately the separate applications of a statute.

C. Title II and the Constitution

As the Sixth Circuit pointed out in Popo-vich, Title II implicates a number of different constitutional protections. 276 F.3d at 813. Popovich held that a'-state court’s refusal to provide a hearing-impaired father with accommodations that would permit him to participate in the proceedings determining the custody of his daughter— and its subsequent alleged retaliation against him for asserting his rights under the ADA — violated due process. Id. at 813-16. As applied to that refusal, the ADA enforced Popovich’s due process rights. Similarly, the Second Circuit’s reasoning in Garcia that individuals may sue a state under the ADA when they can show that state action was motivated'by discriminatory animus or ill will, 280 F.3d at 111-12, views the ADA as enforcing the individual right set forth in City of Cleburne.
The government says correctly that Title II also functions to enforce other constitutional rights, including the rights “to vote, ... to petition officials for redress of grievances, to receive due process from law enforcement, officials, and to be confined where conditions are humane.”[6] In *23 any given case in which a state asserts immunity from private suit under Title II, one or more of these rights may be at stake. If they are, a court considering the immunity defense can review Title II as a straightforward remedy for the violation of rights under the Constitution as interpreted by the courts, rather than applying the more complex analysis required to determine whether Congress has exceeded its bounds when it has created new rights against state action. See Varner v. Ill. State Univ., 226 F.3d 927, 935-36 (7th Cir.2000) (holding that although Congress did not make specific findings of unconstitutional state action relevant to the Equal Pay Act, the Act nevertheless successfully abrogated state immunity because it prohibited “very little constitutional conduct”); Kovacevich v. Kent State Univ., 224 F.3d 806, 820 n. 6 (6th Cir.2000) (“Because ... the EPA does not substantially overreach into largely constitutional activity in the first place, there is no need to search the legislative record as in Kimel.”); see also Florida Prepaid, 527 U.S. at 646-47 (noting that Congress in the challenged statute “did nothing to limit the coverage of the Act to cases involving arguable constitutional violations”).[7]
Thus, we do not rely in this case on the legislative record amassed by Congress in passing Title II of the ADA. The record is substantial, and contains many examples of action by the states themselves that may have violated various provisions of the Constitution. See generally Garrett, 531 U.S. at 391-424 (appendix to opinion of Breyer, J., dissenting). It may be that the legislative record taken as a whole supports Congress’s conclusion that the enactment of Title II taken as a whole, including the abrogation of state immunity, is within the section five power. That is the question reserved by the Court in Garrett, and that would be the question relevant to a challenge to Title II as applied to constitutional state action. It might also be that the legislative record taken as a whole supports some of Congress’s decisions to render states liable for some acts not in violation of the Constitution, but not others. That is the position of the Second Circuit. See Garcia, 280 F.3d at 112.
As additional support for our decision, we note that in the years since the Supreme Court decided the landmark case of Estelle v. Gamble, 429 U.S. 97, 103-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which recognized inmates’ constitutional right to medical care under the Eighth Amendment, the federal courts have recognized many constitutional violations that overlap with Title II as it is applied to prisons. See, e.g., Weeks v. Chaboudy, 984 F.2d 185 (6th Cir.1993) (holding a prison medical director who did not provide a paraplegic inmate with a wheelchair liable for damages under the Eighth Amendment); LaFaut v. Smith, 834 F.2d 389, 392-94 (4th Cir.1987) (Powell, J., sitting by designation) (holding that the failure to provide an inmate with an accessible toilet violated the Eighth Amendment); Maclin v. Freake, 650 F.2d 885, 889 (7th Cir.1981) *24 (per curiam) (concluding that alleging failure to provide physical therapy for a paraplegic inmate stated a colorable claim of an Eighth Amendment violation); see also M. Mushlin, Rights of Prisoners § 3.15, at 167 n. 199 (2d ed. 1993 & Supp.2001) (collecting cases). These cases represent just the sort of “confirming judicial documentation” that Justices Kennedy and O’Connor identified in Garrett as absent for Title I. 531 U.S. at 376 (Kennedy, J., concurring). As Title II is applied to the facts of this case, it protects the constitutional rights of the disabled, and specifically the rights of disabled prison inmates, against discrimination and against cruel and unusual punishment.
Accordingly, we hold that Congress acted within its powers in subjecting the states to private suit under Title II of the ADA, at least as that Title is applied to cases in which a court identifies a constitutional violation by the state. We do not need to reach the question of whether Congress acted within its power in subjecting states to private suit under the full scope of Title II. We also do not need to reach the different question of whether, as the Second Circuit concluded in Garcia, Congress’s power might have extended to some of Title II’s nonconstitutional rules but not to others.[8]

D. Kiman’s allegations of constitutional violations

So far, we have mentioned but not explained our conclusion that Kiman has alleged facts sufficient to establish constitutional violations in this case. We now give our reasons for thinking so. It is clearly established that the Eighth Amendment’s prohibition of “cruel and unusual punishment” forbids prison authorities from subjecting a prison inmate to inhumane conditions. See Hope v. Pelzer, - U.S. -, -, -, 122 S.Ct. 2508, 2514, 2516-18, 153 L.Ed.2d 666 (2002). In Hope, the Court reversed a grant of summary judgment on the question of qualified immunity to prison officials who, in the absence of any emergency, cruelly and unusually punished an inmate by
knowingly subjecting] him to a substantial risk of physical harm, to unnecessary pain caused by ... handcuffs and [a] restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and' taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation.
Id. at 2514. To claim cruel and unusual punishment based on the conditions of confinement, a plaintiff must show deliberate indifference to health or safety on the part of prison officials. Estelle, 429 U.S. at 104-05. As a general matter, prison officials are deliberately indifferent when they do nothing despite obvious and known risks. Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
Kiman’s allegations meet this standard, at least at this stage of the case. Permitting him the means for his daily walks, cuffing his hands in front rather than in back, providing him with a chair for his shower, exempting him from food lines, and giving him a cell that did not require him to climb stairs are matters of appar *25 ently small import to the prison yet of enormous significance to Kiman. The prison’s failure to do these things, in the context of his illness and its consequent disabilities, can easily be called deliberate indifference to his welfare. See Weeks, 984 F.2d 185. Failure to provide him with accessible sanitary facilities may rise to the same level. See LaFaut, 834 F.2d at 392-94. So too the allegedly deliberate (indeed, allegedly malicious) denial of prescribed medications. See Miranda v. Munoz, 770 F.2d 255, 257-59 (1st Cir.1985).[9]
We conclude that Kiman has alleged violations of the Eighth Amendment. Accordingly, we hold that Kiman may proceed with his suit against the Department, because Title II of the ADA as applied to the facts of this case properly enforces the Eighth Amendment (as incorporated against the states by the Fourteenth) and abrogates New Hampshire’s immunity from private suit. It may be that on remand Kiman will fail to prove his allegations, or that the Department, which has not yet answered Kiman’s complaint, may allege and prove other facts that rebut the inference of deliberate indifference. To the extent that Kiman’s allegations may also state violations of Title II that do not violate the Constitution — his complaint refers at one point to a “negligent violation of Title II” — we leave the disposition of those claims to the district court, based on the principles we have set forth, after elaboration of the facts and further briefing by the parties.
III.
After considering the application of Title II of the ADA to the allegations in this case, which describe egregious conduct that, if it occurred and was not adequately justified, violated Matthew Kiman’s constitutional rights, we conclude that Kiman may, consistent with the Eleventh Amendment and the principle of state sovereign immunity, sue the Department of Corrections of the State of New Hampshire. Our decision does not indicate any factual support for Kiman’s allegations; the district court will determine that at a later stage of the proceedings. We reverse the judgment of the district court and remand this case for further proceedings consistent with this opinion.

. Kiman’s counsel stated at oral argument that Kiman is no longer pursuing the individual defendants.

. Because Kiman can no longer benefit from injunctive relief, and because he has sued the Department of Corrections in its own name, this case does not involve the application of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). See generally Idaho v. Coeur d’Alene Tribe, 521 U.S. 261, 289, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (O'Connor, X, concurring in part and concurring in the judgment) ("In Young, the Court held that a federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law, even if the State itself is immune from suit under the Eleventh Amendment.... Where a plaintiff seeks prospective relief to end a state officer's ongoing violation of federal law, such a claim can ordinarily proceed in federal court."). Garrett made clear that all of the ADA still binds the states and can be enforced by private individuals through Ex parte Young suits for injunctive relief against state officials. Garrett, 531 U.S. at 374 n. 9 (noting as well that the United States may still sue states for money damages under the ADA).
Similarly, although the states are immune from only those private suits to which they have not consented, there is no question of consent in this case and in the text we refer simply to private suits generally.

. The Supreme Court has held that Title II of the ADA applies to state prisons. Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

. Part II.D of this opinion explains in more detail our conclusion that Kiman has alleged constitutional violations.

. Kiman and the government have urged us to hold that Title II is wholly constitutional. The government has taken in the alternative the position that Title II is constitutional at least as applied to the facts of this case. The district court considered and rejected the theory that we now adopt when it distinguished Garcia, relying on Kiman's failure to allege intentional discrimination in those explicit words.

. Some of these rights are guaranteed by provisions of the Bill of Rights that apply to the states through the Due Process Clause of the Fourteenth Amendment and are thus within Congress’s section five enforcement power. See City of Boerne, 521 U.S. at 519 (concluding that Congress has power under section five to enforce the provisions of the First Amendment as incorporated in the Fourteenth Amendment’s Due Process Clause). *23 The Eighth Amendment’s prohibition of cruel and unusual punishment is among those provisions. Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

. See generally D. Meltzer, Overcoming Immunity: The Case of Federal Regulation of Intellectual Property, 53 Stan. L.Rev. 1331, 1347-48 (2001) (suggesting that “the validity of a statute that merely regulates unconstitutional conduct itself should not require an additional showing of widespread violations by the states”); Recent Case, Popovich v. Cuyahoga County Court of Common Pleas, 276 F.3d 808 (6th Cir.2002), 115 Harv. L.Rev. 2341, 2348 (2002) ("There seems little need to insulate states from private suit when such insulation accomplishes nothing except the protection of activities that violate the Constitution.”).

. Garcia placed particular emphasis on the nature of the private cause of action under Title II, which incorporates the implied cause of action under Title VI of the Civil Rights Act of 1964, and on the resulting "measure of latitude” allowed to the courts "to shape a sensible remedial scheme that best comports with the statute.” 280 F.3d at 111 (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 284-85, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)) (internal quotation marks omitted).

. Kiman's allegations may also state a claim under the Fourteenth Amendment's Equal Protection Clause, on the theory that prison officials' actions towards him were irrational and unmotivated by any legitimate basis for government action. See City of Cleburne, 473 U.S. at 447-50 (finding a violation of equal protection on such grounds); cf. Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (holding that such a violation may occur when the government singles an individual out for irrational and arbitrary treatment). That is a reasonable inference from the conduct described, and the district court was bound to draw reasonable inferences in favor of Kiman at this stage of the case. Thus, we disagree with the district court’s statement that Kiman “does not allege that he was the victim of intentional discrimination.”
We acknowledge the Sixth Circuit's holding in Popovich that individuals may not sue the states under Title II of the ADA under theories based on equal protection. 276 F.3d at 812 & n. 4. The Popovich court reasoned that those theories would tread too close to the Supreme Court's holding in Garrett. Id. Our basis for distinguishing Garrett from this case, however, is not that the legislative record is stronger for the Eighth Amendment than for the Equal Protection clause, nor that the record is stronger for Title II than for Title I, but instead that this case on its fácls involves a constitutional violation. This reasoning applies no less to a denial of equal protection than to a cruel and unusual punishment.