Kiman v. NH DOC                              CV-01-134-PB   05/25/05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Matthew Kiman**

   v.                                    **Case No.  01-CV-134-PB**
                                         Opinion No. 2005 DNH 088
**N.H. Department of Corrections, et al.**


### MEMORANDUM AND ORDER

Matthew Kiman, a former New Hampshire State Prison inmate

who suffers from amotrophic lateral sclerosis ("ALS"), has sued

the New Hampshire Department of Corrections ("DOC") and 13

individuals under Title II of the Americans With Disabilities Act

("Title II"), 42 U.S.C. §§ 12131-12165 (1994).[1]  Kiman argues

that defendants violated Title II both by failing to properly

treat his disease and by failing to reasonably accommodate his

_____

[1]  The 13 individual defendants are Warden Michael
Cunningham; Physical Therapist Bernadette Campbell; Corrections
Officer ("C.O.") Michael Campano; C.O. Brian Gauthier; Corporal
John Haney; C.O. Michael Corrira; RNC David Southard; C.O.
Michael Kenney; C.O. Brian Dunham; C.O. Michael Poulicakos; C.O.
Roger Dugre; Nurse Jeanette Hoffstede, A.R.P.N.; and Dr. Charles
Ward.  Kiman has sued these defendants in both their individual
and official capacities.

resulting disability.[2]  Defendants contend that they are entitled to summary judgment on Kiman's Title II claims.

## I.  PROCEDURAL HISTORY

Kiman initiated this action on April 29, 1999, by filing a charge against the DOC with the New Hampshire Human Rights Commission.  On May 3, 1999, the Commission informed him that it lacked jurisdiction over Title II and referred him to the United States Department of Justice.  Several weeks later, on May 24, 1999, Kiman filed a complaint under Title II with the Civil Rights Division of the Department of Justice.  Kiman's counsel and the Department of Justice exchanged several letters and the Department ultimately decided not to take action on his behalf. On April 16, 2001, Kiman filed suit in federal court.

Defendants moved to dismiss on August 10, 2001.  They first argued that Kiman could not state a claim under Title II because Congress had exceeded its power under section five of the

---

[2]  Kiman also bases state law negligence claims on the same pattern of alleged misconduct.  Defendants argue that I should decline to exercise supplemental jurisdiction over these claims.

Fourteenth Amendment when it purported to abrogate the states'

Eleventh Amendment immunity by adopting Title II.  Kiman v. N.H.

Dep't of Corr., 301 F.3d 13, 16 (1st Cir. 2002).  Defendants next

argued that Title II does not provide a cause of action against

state officers in their individual capacities.  Id.  Finally,

defendants maintained that their first two arguments eliminated

all of Kiman's federal causes of action, and that the court

should therefore decline to exercise supplemental jurisdiction

over his state law claims.  Id.  In response, Kiman primarily

argued that Congress had properly exercised its section five

power through Title II.  Id.

On December 19, 2001, I granted defendants' motion to

dismiss.  Kiman v. N.H. Dep't of Corr., 2001 WL 1636431 (D.N.H.).

In so doing, I noted that in Board of Tr. of Univ. of Ala. v.

Garrett, 531 U.S. 356 (2001), the Supreme Court held that

Congress had failed to abrogate the states' Eleventh Amendment

immunity in adopting Title I of the ADA.  Kiman, 2001 WL 1636431,

at *1.  I then followed the Fifth, Second, and Tenth Circuits in

concluding that the same is true with respect to  Title II.

Kiman, 2001 WL 1636431, at *1 (internal citations omitted).

Kiman appealed this decision and, on August 20, 2002, a

divided panel of the First Circuit reversed, holding that
"Congress acted within its powers in subjecting the states to
private suit under Title II of the ADA, at least as that Title is
applied to cases in which a court identifies a constitutional
violation by the state." Kiman, 301 F.3d at 24. Thereafter, on
November 13, 2002, the First Circuit granted Kiman's petition for
rehearing en banc, withdrew the August 20, 2002 panel opinion,
and vacated the judgment. Kiman v. N.H. Dep't of Corr., 310 F.3d
785, 785 (1st Cir. 2002). On June 13, 2003, an equally divided
en banc court affirmed my December 19, 2001 judgment. Kiman v.
N.H. Dep't of Corr., 332 F.3d 29, 29 (1st Cir. 2003). Finally,
on May 24, 2004, the United States Supreme Court granted Kiman's
petition for writ of certiorari and remanded the case to the
First Circuit for further consideration in light of its decision
in Tennessee v. Lane, 541 U.S. 509 (2004). Kiman v. N.H. Dep't
of Corrs., et al., 124 S. Ct. 2387 (2004). The First Circuit
then remanded the case to this court for further consideration
(Civ. No. 01-134-PB, Docket No. 24). Following the close of
discovery, defendants filed the present motion for summary
judgment.

## II. BACKGROUND

## A. ALS

ALS, more commonly known as Lou Gehrig's Disease, is a progressive neurodegenerative disease that causes certain nerve cells in the brain and spinal cord to die. Over time, its victims lose the ability to control their voluntary muscles, a process that causes the muscles to atrophy, and eventually leads to complete paralysis and ultimately to death. See "About ALS: What is ALS?," at http://www.alsa.org/als/what.cfm (last visited May 12, 2005). The initial symptoms of ALS can vary from person to person and, at onset, the symptoms can be so slight that they are frequently overlooked. See "About ALS: Symptoms of ALS," at http://www.alsa.org/als/symptoms.cfm (last visited May 12, 2005). The rate at which the disease progresses also can vary widely from one person to another and not all people with ALS experience the same symptoms or the same sequences or patterns of progression. See id. As a result, ALS is extremely difficult to diagnose. See "About ALS: Diagnosing ALS," at http://www.alsa.org/als/diagnosing.cfm (last visited May 12, 2005). No definitive test or procedure to establish an ALS diagnosis currently exists. See id. Rather, it is usually

diagnosed through a clinical examination and a comprehensive series of diagnostic tests, including electrodiagnostic tests such as electromyography and nerve conduction velocity, blood and urine studies, a spinal tap, x-rays, magnetic resonance imaging ("MRI"), myelogram of the cervical spine, and muscle and nerve biopsies. See id. Although this protocol is used in an attempt to rule out other diseases that mimic ALS, it often is only after the patient shows definitive signs of the disease that a physician can diagnose ALS conclusively. See id. For this reason, a second opinion is strongly recommended. See id.

B. **Kiman's Confinement at the State Prison**

Kiman was incarcerated at the New Hampshire State Prison from December 1, 1995 through July 1996, and then again from April 2, 1997 through January 8, 1998. On March 2, 1998, after serving a consecutive sentence in Massachusetts, Kiman returned to New Hampshire and entered Calumet House in Manchester, a DOC-operated facility for work release and community re-integration. On May 4, 1998, Kiman was released to the community on intensive supervised parole. Defs.' Ex. 10, Kiman Dep. Vol. I, at 123:2-124:6. Kiman was returned to the New Hampshire State Prison on

September 23, 1998 because of two parole violations.  After serving approximately four months, he was paroled again and released from prison on January 28, 1999.

Kiman first exhibited signs of a disability while incarcerated in 1997.  At that time, he reported experiencing numbness and pain in his left leg and left buttocks, which he thought might have been the result of an earlier back injury.  Defs.' Mot. for Summ. J., Ex. 21 ("Defs.' Ex.").  Following this report, he was seen for physical therapy several times between October and December 1997, during which his gait was reported to be "steady."  Defs.' Exs. 22-24.  On December 17, 1997, Kiman saw Nurse Jeanette Hoffstede, A.R.P.N., reported difficulty with his left shoulder, and indicated that he may have injured it.  Defs.' Ex. 25.  Nurse Hoffstede sought an assessment from the prison's physical therapist, Bernadette Campbell.  An appointment was scheduled, but was later cancelled, because Kiman was paroled to serve his sentence in Massachusetts.  See Defs. Ex. 25.  Nevertheless, prior to Kiman's departure to Massachusetts, Dr. David Denune and Mark O'Dell, C.C.S.W., wrote to future psychiatric treatment providers, notifying them of Kiman's

psychiatric and physical diagnoses and his recent treatment.
Defs.' Ex. 26.  Kiman did not see a specialist for his leg and
shoulder problems while he was incarcerated in Massachusetts.
Defs.' Ex. 11, Kiman Dep. Vol. II, at 11:8-10.

Kiman saw Dr. Jay Smith at the Manchester Community Health
Care Center on April 7, 1998, after he had returned to New
Hampshire and was residing at Calumet House.  Defs.' Ex. 27.  Dr.
Smith noted that Kiman's case was "rather confusing" because his
symptoms suggested "an acute neurological problem," such as "a
stroke, an intercranial bleed or a mass lesion," but that the
presence of fasciculation[3] on both sides of his body suggested
that "it is more likely to be a peripheral neuropathy of some
toxic or metabolic sort."  Id.  Dr. Smith thus recommended that
Kiman consult a neurologist to rule out a brain lesion and to get
a heavy metal screen.  Id.; Defs.' Ex. 10, Kiman Dep. Vol. I, at
11:14-20.  When Dr. Smith discovered during a second appointment
with Kiman several days later that Kiman had yet to see a
neurologist, he speculated that "something in our system has

---

[3]  "Fasciculation" is the involuntary contraction, or
twitching, of groups of muscle fibers.  Stedman's Medical
Dictionary, 567 (25th ed. 1990).

broken down as I had made the recommendation that we get him in with a neurologist . . . as soon as possible." Defs.' Ex. 27.

Kiman was examined approximately two weeks later by Dr. Daniel Botsford, Jr. of Neurology Associates of Southern New Hampshire. Defs.' Ex. 28. Dr. Botsford arranged for electromyography and nerve conduction studies, and later explained in a letter to Dr. Smith that he feared that Kiman "may have a motor neuron disease." Id. After reviewing the results of the heavy metal screen, which were negative, Dr. Botsford discussed Kiman's case with his partner, Dr. Mark Biletch, M.D., but "refrained from achieving and declaring a diagnosis of motor neuron disease." Defs.' Ex. 29. As Dr. Botsford explained, despite the presence of "unambiguous neurologic illness" and "signs of active denervation and reinnervation," he could not conclude that they "achieve the level of motor neuron disease right now." Id. He thus ordered immunological testing and suggested that Dr. Biletch, a neuromuscular specialist, examine Kiman. Id. Dr. Biltech was unable to evaluate Kiman, however, because Kiman missed two appointments while on parole. Defs.' Ex. 30. Without a second opinion, Dr. Botsford was could not

confirm an ALS diagnosis and thus did not discuss ALS with Kiman. Defs.' Ex. 31. Instead, he talked to Kiman about the possibility that he suffered from muscular dystrophy. Id.

Kiman was initially assigned to the Reception and Diagnostics unit ("R&D") when he returned to prison. Defs.' Ex. 4, Affidavit of Anna Fazzina, ¶ 2; Defs.' Ex. 8, Affidavit of Dr. Charles Ward, ¶ 2. While in R&D, inmates are typically in quarantine for one week, and during that time are tested for infectious diseases including HIV, AIDs, tuberculosis, and hepatitis C. Id. The time spent in R&D also allows corrections officials to obtain a complete medical history and medical records from the inmate's treating physician. Id. Finally, corrections staff assess the inmate's physical condition and medical needs. Id. While under quarantine, inmates are permitted to leave their cells only once each day to use the shower. Defs.' Ex. 3, Affidavit of Gregory Crompton, ¶ 6; Defs.' Ex. 11, Kiman Dep. Vol. II, at 14:11-21. In some cases an inmate may remain in R&D after the medical screening has been completed while he is waiting for a housing assignment. Defs.' Ex. 3, Crompton Aff., ¶ 6. For security purposes, only inmates who are

in quarantine are housed on the first tier; others are housed on the third tier and are required to use the stairs. Id., ¶ 9.

Kiman was housed in R&D from September 23, 1998 until October 19, 1998, although he was not in quarantine for his entire stay in that unit. Defs.' Ex. 3, Crompton Aff., ¶ 4. There, Nurse Hoffstede conducted his initial medical screening. Defs.' Ex. 33. Kiman told Nurse Hoffstede that he recently had been diagnosed with a "muscle deficiency," which he believed to be muscular dystrophy. Id. Hoffstede noted weakness, muscle spasms, and atrophy in Kiman's left shoulder and arm, and he told her that at times his muscles "seize up." Id. The following day, September 24, 1998, Nurse Hoffstede issued Kiman a bottom bunk pass that was in effect for the entire time he was incarcerated. Defs.' Ex. 34. Between September 24, 1998, and his release on January 28, 1999, Kiman did not file any complaints alleging that the prison staff failed to honor his bottom bunk pass. Defs.' Ex. 3, Crompton Aff., ¶ 8. Moreover, while housed in R&D, Kiman did not make any requests for a cell on a lower tier, nor did he request any accommodation or ask for assistance with walking or personal hygiene. Id., ¶¶ 9, 12.

-11-

Kiman requested a cane during his initial screening in the

R&D unit.  Defs. Ex. 33.  He did so despite the fact that he did

not need a cane before he had been paroled to Massachusetts.

Defs.' Ex. 5, Affidavit of Bernadette Campbell, ¶ 2.  Several

days later, after Kiman still had not received a cane, he began

to submit Inmate Request Slips demanding that he be allowed to

use a cane.[4]  Defs.' Exs. 35-37; see Defs.' Ex. 11, Kiman Dep.

Vol. II, at 118:8-25.  Between September 27, 1998 and September

30, 1998, he made five requests for his cane.  Defs.' Ex. 35-37;

Defs.' Ex. 8, Ward Aff., at ¶ 4.  Kiman finally received his cane

on October 2, 1998.  Defs.' Ex. 39; Defs.' Ex. 8, Ward Aff., at ¶

4.  Defendants have explained that they were unable to eariler

---

[4]  Inmates are required to comply with Policy and Procedure
Directive ("PPD") 1.16 when registering complaints and
grievances.  Defs.' Ex. 3, Crompton Aff., ¶ 3.  Pursuant to PPD
1.16, an inmate who wants to make a request or file a complaint
related to medical treatment must fill out an Inmate Request
Slip.  Id.  If the inmate is unsatisfied with the prison's
response to the Inmate Request Slip, PPD 1.16 instructs him to
file a grievance with the Warden, and if still unsatisfied, he
must appeal the Warden's decision to the Commissioner.  Id.
Alternatively, an inmate seeking medical attention or treatment
may report to "sick call."  Id.  Kiman was provided with the
inmate handbook containing these policies and, as the evidence
shows, he was familiar with the procedure for making requests for
accommodations.  Defs.' Ex. 11, Kiman Dep. Vol. II, at 17:1-18:1
and 20:19-21:11.

accommodate his request because, for both medical and security purposes, they first needed to verify that he needed a cane. Defs.' Ex. 8, Ward Aff., at ¶ 4. While Kiman was in quarantine, he was confined to his small single cell, except for a daily trip to the shower. Defs.' Ex. 9, Affidavit of Brian Dunham, ¶ 2. Thus, he had only a limited need for a cane during this period.

Following the R&D screening, the corrections staff confirmed that Kiman had been prescribed Trazodone (150 mg per day) for sleep and Baclofen (60 mg per day) as a muscle relaxant. Defs.' Ex. 33. The prison's physician renewed these prescriptions on September 24, 1998, for a course to last through October 24, 1998. Defs.' Ex. 6, Affidavit of Judith LaForest, DOC Director of Pharmacy, ¶ 2. Baclofen was prescribed on an "as needed" basis. Id. Medication that is not taken by inmates is returned to the prison pharmacy. Id. Both Baclofen and Trazodone are considered "yellow" medications, which indicates that they can be made available by corrections staff at four different times of the day, depending upon the physician's orders. Id. By tracking medications that have been returned to the pharmacy, the corrections staff can monitor an inmate's compliance in taking

his medications.[5]  Id.

Kiman completed another Inmate Request Slip on October 8, 1998, in which he complained that he was only getting one-fourth the dosage of Baclofen that he was taking prior to his return to prison, and that the corrections staff were not delivering the medication to him.  Defs.' Ex. 41.  In this request, Kiman also asked to double the dosage of Baclofen and be prescribed Topomax. Id.  During this period, only two tablets of Kiman's Baclofen were returned to the pharmacy and none of his Trazodone was returned, indicating that Kiman had been receiving and taking his medication.  Defs.' Ex. 6, LaForest Aff., ¶ 2.  Four days later, Dr. Ward responded to Kiman's request slip and notified him that he was scheduling a doctor's appointment for Kiman before ordering a change in his medications.  Defs.' Ex. 41.  Kiman completed a second Inmate Request Slip on October 9, 1998, and a

_____

[5]  An inmate ordinarily is responsible for requesting a refill of his medication.  Defs.' Ex. 6, LaForest Aff., ¶ 3. Here, Kiman's physician renewed the Baclofen prescription from October 30, 1998 through November 13, 1998.  Id.  According to the prison pharmacist, Kiman took approximately one half of his medication during this cycle.  Id.  Because Baclofen was prescribed on an "as needed" basis, corrections staff would not have alerted Kiman's physician of his failure to take all of this medication.  Id.

third on October 10, 1998, raising similar issues before he received Dr. Ward's response. Defs.' Exs. 42-43. The corrections staff responded to these request slips and informed Kiman that he was responsible for renewing his own prescriptions. Id.

On October 19, 1998, Kiman was transferred to the Special Housing Unit ("SHU") after he received a disciplinary report for "Inciting a Riot" while in the prison yard, Defs.' Ex. 32. He remained there until November 6, 1998. Defs. Ex. 3, Crompton Aff., ¶ 4. While housed in the SHU, Kiman took all meals in his cell and was permitted to leave the cell only to use the shower or for recreation. Defs.' Ex. 3, Crompton Aff., ¶ 7. He was not permitted to have his cane while housed in the SHU because it posed too great a security risk. Defs.' Ex. 3, Crompton Aff., ¶ 7. Because Kiman did not have his cane, he was not allowed to participate in recreation in the SHU yard. Defs.' Ex. 48. Instead, Dr. Ward issued him a pass to use the dayroom for recreation, which in the SHU was on the same floor as both Kiman's cell and the showers. Defs.' Ex. 49; Defs.' Ex. 8, Ward Aff., ¶ 8.

Kiman was handcuffed from behind and escorted by two corrections officers when he was initially transported to the SHU. Defs.' Ex. 50. Kiman completed an Inmate Request Slip to complain about this treatment, as well as the lack of medications and exercise. Id. The following day, in response to his request slip, he was examined by a nurse and an x-ray of his shoulder was ordered. Defs.' Ex. 40 & 47. Kiman was also seen by Bernadette Campbell, the prison physical therapist, who noted that he arrived at the medical treatment room handcuffed in front and using his cane. Defs.' Ex. 5, Campbell Aff., ¶ 6; Defs.' Ex. 47. Campbell explained to him that security concerns precluded him from using his cane in the SHU yard. Defs.' Ex. 5, Campbell Aff., ¶ 6. She then issued him a front handcuff pass and spoke to Dr. Ward about getting Kiman a consultation with an outside specialist. Defs.' Ex. 5, Campbell Aff., ¶ 6; Defs.' Ex. 51. Kiman renewed his prescription for Baclofen for the period between October 30, 1998 and November 30, 1998. Defs.' Ex. 6, LaForest Aff., ¶ 3. Approximately one-half of these dosages were returned to the pharmacy. Id. When Kiman's prescription for Trazodone ran out, he said he was willing to try Prozac instead, and was given a prescription for a two-week cycle between October

-16-

29, 1998 and November 12, 1998. Defs.' Ex. 53. He took the Prozac for approximately one week, until November 7, 1998, Defs.' Ex. 6, LaForest Aff., ¶ 3. Kiman then refused the Prozac, and corrections officers notified the medical staff. Defs.' Ex. 54. Kiman's refusal to take Prozac was also noted in several psychiatric consultations done while he was housed in SHU. Defs.' Ex. 53-55.

On November 6, 1998, Kiman was moved from SHU to the Closed Custody Unit ("CCU"), where he remained until November 24, 1998. Defs.' Ex. 3, Crompton Aff., ¶ 4. Everything in the CCU is on one level, and Kiman was thus not required to use the stairs regularly. Defs.' Ex. 11, Kiman Dep. Vol. II, at 45:1-10. While he was in the CCU, Kiman made several requests using the Inmate Request Slip procedure. He reported pain in his shoulder, lack of exercise, and low doses of medications, Defs.' Ex. 56 & 57. He also asked for permission to use the weight room. Defs.' Ex. 58 & 59. Kiman was told to report to sick call for medical treatment. Defs.' Ex. 4, Fazzina Aff., ¶ 4. With respect to his request for access to the weight room, physical therapist Campbell scheduled another appointment with Kiman, see Defs.' Ex.

58, but ultimately rejected his request based upon her professional opinion regarding his course of treatment. Defs.' Ex. 5, Campbell Aff., ¶ 8.

On November 13, 1998, Kiman inquired about a consultation with Dr. Biletch. Defs.' Ex. 62. Three days later, Dr. Ward responded that in his opinion, a consultation was not necessary because the prison had received the records regarding Kiman's extensive neurological testing from earlier in the year. Id. Kiman completed an Inmate Request Slip on November 30, 1998, again requesting a consultation with a neurologist. Defs.' Ex. 45. Dr. Ward answered Kiman's request several days later and told him that he had ordered a consultation with Dr. Biletch and that the dosage of Baclofen he was taking in prison was the same as it had been outside prison. Id.

Kiman was moved to the Minimum Security Unit ("MSU") on November 24, 1998. Defs.' Ex. 3, Crompton Aff., ¶ 4. While housed in the MSU, Kiman was taking his medications as prescribed, see Defs.' Ex. 6, LaForest Aff., ¶ 5, and made no requests for accommodations with respect to access to meals, showers, or recreation. Defs.' Ex. 3, Crompton Aff., ¶¶ 9-10.

-18-

Kiman was sent back to R&D on January 4, 1999, pending review of a disciplinary infraction for disruptive behavior. When he arrived at R&D, Kiman immediately filed a grievance with the Warden about being handcuffed in back, despite having a front cuff pass. Defs.' Ex. 66 & 67. An investigation by the corrections staff revealed, however, that Kiman was not carrying the front cuff pass with him, as prison regulations require. Id. The investigation also revealed that the corrections officers who escorted him to R&D assisted him on the walk because he did not have his cane. Id. Kiman's allegation that C.O. Kenney had taken his pass away was determined to be unfounded. Defs.' Ex. 3, Crompton Aff., ¶ 5. The day after he returned to R&D, Kiman complained that he had fallen in the shower and did not receive adequate care. Defs.' Ex. 68. As a result, on January 6, 1999, Kiman went to the infirmary and was issued a pass for a shower chair. Defs.' Ex. 70 & 71. The pass indicated that shower chairs were available from the infirmary. Defs.' Ex. 71. Following this request, a shower chair was left near the showers at the end of the tier for Kiman to use. Defs.' Ex. 7, Affidavit of Michael Poulicakos, ¶ 3.

Kiman requested an "early chow pass," also known as a "slow movement" pass, on January 6, 1999 because, as he told the nurse, standing in the cold bothered him. Defs.' Ex. 70. Because the inmates housed in R&D are in quarantine, protective custody, or some other form of restrictive confinement, and because their movement involves heightened security concerns, they do not eat their meals at the same time as the rest of the inmate population. Defs.' Ex. 3, Crompton Aff., ¶ 10; Defs.' Ex. 9, Dunham Aff., ¶ 3. Accordingly, they are not allowed "slow movement" passes but can ask to take their meals in their cells. Id. An R&D inmate who is too sick or physically unable to go to chow can request a "cell feed" through the infirmary. Defs.' Ex. 4, Fazzina Aff., ¶ 7. There is no record that Kiman requested a cell feed while he was in R&D. Id.; Defs.' Ex. 70.

During his second stay in R&D, Kiman used an Inmate Request Slip dated January 8, 1999 to complain again that he was being denied access to the weight room and to request access to a handicapped shower. Defs.' Ex. 69. He also complained that he still had not been seen by Dr. Biletch. Id. In response, Dr. Ward told Kiman that Dr. Biletch had to reschedule his

-20-

appointment due to a conflict.  Id.  Dr. Ward did not, however, address Kiman's shower question because it was clear to him from the progress notes that the infirmary had recently issued Kiman a shower chair pass.  Defs.' Ex. 8, Ward Aff., ¶¶ 11-12.  Kiman wrote three Inmate Request Slips on January 16, 1999, two to Dr. Ward and one to Bernadette Campbell, requesting that his passes be renewed and complaining of a lack of physical therapy.  See Defs.' Ex. 72-74.  Campbell responded that the medical staff had been monitoring his case closely and that she had been seeing him on a regular basis.  Defs.' Ex. 74.  Dr. Ward responded to both request slips, notifying Kiman that all of his passes would be renewed, but denying his request to use the weight room.  Defs.' Ex. 72.  Dr. Ward also renewed Kiman's prescription for Baclofen.  Id.  Finally, Dr. Ward issued a Kiman an early chow pass to be used when he returned to MSU, where early chow was permitted.  Defs.' Ex. 8, Ward Aff., ¶ 12; Defs.' Ex. 9, Dunham Aff., ¶ 3.

Kiman was examined by Dr. Biletch in Manchester on January 21, 1999.  Defs.' Ex. 3, Crompton Aff., ¶ 4; Defs.' Ex. 75.  He then returned to MSU where he remained until he was paroled on January 28, 1999.  Id.  Dr. Biletch confirmed the ALS diagnosis

and added Riloteck to Kiman's prescriptions. Defs.' Ex. 75. Although Rilotek was not available through the prison pharmacy at that time, it was not ordered because the parole board informed Dr. Ward that Kiman was being released the following week. Defs.' Ex. 75 & 76. Dr. Ward and Dr. Denune did, however, order that Kiman's other medications be continued until two weeks after the date of his release. Defs.' Ex. 77.

## III.  STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A material fact is one that affects the

outcome of the suit.  See id. at 248.

In ruling on a motion for summary judgment, I must construe the evidence in the light most favorable to the non-movant.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).  The party moving for summary judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249).  Neither conclusory allegations, improbable inferences, or unsupported speculation are sufficient to defeat summary judgment.  See Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002).

## IV.  ANALYSIS

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Accordingly, a plaintiff seeking relief under Title II "must establish: (1) that he is a qualified individual with a disability; (2) that he was excluded from participating in, or denied the benefits of a public entity's services, programs, or activities, or otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability." Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000).

Federal regulations implementing Title II also require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or

activity."[6]  28 C.F.R. § 35.130(b)(7).  To recover under the regulations, a plaintiff ordinarily must specifically request the modification in question.  See Reed v. Lepage Bakeries, Inc., 244 F.3d 254, 260 (1st Cir. 2001) (recognizing requirement under Title I).  A plaintiff also retains the burden of proving both that the requested modification is necessary to avoid discrimination and that, "on the face of things," the requested modification is reasonable.  See id. (reasonableness requirement under Title I); see also Johnson v. Gambrinus Co./Spoetzl Brewery, 116 F.3d 1052, 1059 (5th Cir. 1997) (reasonableness requirement under Title III).  In any event, a plaintiff has no right to a requested modification if the defendant offers an alternative modification that will reasonably accommodate her disability.  See Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1261 (10th Cir. 2001) (Title I).  Once a plaintiff has proved that a requested modification is both necessary and reasonable, the burden shifts to the defendant to prove that the

_____

[6] Although Title II uses the term "reasonable modification," rather than "reasonable accommodation," these terms create identical standards and are used interchangeably. McGary v. City of Portland, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004)(citing Wong v. Regents of the Univ. of Cal., 192 F.3d 807, 816 n.26 (9th Cir. 1999)).

modification would fundamentally alter the nature of the program or activity under review.  See Johnson, 116 F.3d at 1059.

Context is crucial when evaluating the reasonableness of a requested modification.  This is especially true in prison cases, where the court must be mindful of "the necessary balance between [Title II's] worthy goal of integration and a prison's unique need for security, safety and other penological concerns." Miller v. King, 384 F.3d 1248, 1266 (11th Cir. 2004).  Thus, "[t]he assessment whether a proposed accommodation is 'reasonable' or whether it would place an undue burden on the defendant, must . . . include consideration of the prison environment."  Shedlock v. Dep't of Corr., 818 N.E.2d 1022, 1033 (Mass. 2004).

Kiman alleges in Count I of his complaint that defendants violated Title II by failing to properly treat his ALS.  Compl. ¶¶ 3-11.  He alleges in Count II that defendants violated Title II by failing to reasonably accommodate his resulting disability. Compl. ¶¶ 12-21.  Defendants argue that Kiman cannot prove either

claim.[7]  For the following reasons, I find defendants' arguments persuasive.

## A.    Defendants Adequately Diagnosed and Treated Kiman

As to Kiman's first cause of action, a careful review of the record demonstrates that his claim is meritless because the undisputed evidence establishes that defendants responded appropriately in diagnosing and treating his ALS.[8]

---

[7]  Defendants alternatively argue that Kiman's Title II claims against the DOC and the individual defendants in their official capacities are barred by the Eleventh Amendment.  They also argue that the individual defendants cannot be sued under Title II in their individual capacities.  Because I conclude that defendants did not violate Title II, I need not reach these arguments.

[8]  A number of courts have concluded that the ADA does not create a remedy for medical malpractice or Eighth Amendment violations.  See Moore v. Prison Health Servs., 24 F. Supp. 2d 1164, 1167 (D. Kan. 1998); see also Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996); Rosado v. Alameida, 2005 WL 892120, at *3 (S.D. Cal. Feb. 8, 2005); Hamlin v. Prison Health Servs., Inc., 2004 WL 2980749, at *10-*11 (D. Me. Dec. 22, 2004).  In light of these precedents, it is difficult to understand how Count I could be cognizable as a Title II claim.  Nevertheless, I need not consider whether a failure to diagnose and treat a disabling medical condition could ever be cognizable under Title II because I determine that defendants acted reasonably in diagnosing and treating Kiman's condition.

When Dr. Smith first examined Kiman in April 1998, he noted that Kiman's condition was "rather confusing," and that he was unable to conclusively determine if Kiman had an acute neurological problem such as a stroke, a brain lesion, or a peripheral neuropathy.  Seeking further insight into Kiman's condition, Dr. Smith referred him to Dr. Botsford, a neurologist.  Several weeks later, Dr. Botsford examined Kiman and conducted a series of tests that revealed the presence of an "unambiguous neurologic illness" and signs of "active denervation and reinnervation."  Notwithstanding this evidence, Dr. Botsford was unable to conclude that Kiman was suffering from a motor neuron disease such as ALS.  Instead, he ordered more tests and, consistent with the diagnostic protocol for ALS, he sought a second opinion from his partner, Dr. Biletch, a neuromuscular specialist.  Dr. Biletch was unable to provide a second opinion, however, because Kiman missed two scheduled appointments after he was released on parole.  Kiman therefore cannot claim that defendants are responsible for failing to diagnose his ALS before he returned to prison in September 1998 because, as the record reveals, Kiman made it impossible for defendants to do so.

Nor can Kiman claim that defendants failed to timely diagnose his ALS after he returned to prison. Although Dr. Ward initially believed when Kiman again requested a consultation with a neurologist in November 1998 that he had sufficient information to properly treat Kiman without a consultation, he changed his mind several days later and promptly scheduled an appointment for Kiman with Dr. Biletch. It was a conflict that originated in Dr. Biletch's office, rather than anything that the defendants did, that delayed the appointment until January 21, 1999. Based on these facts, there is no basis for Kiman's claim that defendants acted unreasonably in failing to earlier diagnose his ALS.

Finally, Kiman cannot claim that defendants failed to properly treat his condition. Upon his return to prison in September 1998, the prison medical staff promptly obtained his medical records, including those from Dr. Botsford. Defendants also confirmed that he had been prescribed Trazodone and Baclofen while on parole, and renewed these medications for him several times while he was incarcerated. Likewise, when Kiman asked the medical staff to double the dosage of Baclofen and to prescribe Topomax for him, Dr. Ward reasonably scheduled an appointment to

-29-

review his requests before authorizing a change in his medications. Moreover, as part of his treatment, Kiman had regular sessions with the prison physical therapist Bernadette Campbell, who recommended walking and range of motion exercises. That Campbell refused to permit Kiman to use the weight room because she did not believe it was medically appropriate for him does not render her treatment unreasonable. Kiman thus has presented no credible evidence that defendants failed to properly diagnose and treat his condition, and I therefore conclude that this claim is baseless.

B. **Defendants Reasonably Accommodated Kiman's Disability**

Kiman's primary claim is that defendants failed to respond to his reasonable requests to accommodate his disability. He specifically charges that defendants violated Title II by denying him the use of his cane, denying him an early chow pass, handcuffing him behind his back, refusing to provide him with a shower chair, housing him on the third tier of the prison, requiring him to sleep on the top bunk, and failing to provide handicapped facilities in his cell. I address each alleged violation in turn.

## 1. Request for a Cane

Kiman argues that defendants violated Title II by denying him the use of a cane for two brief periods during the approximately four months between his return to prison in September 1998 and his release on parole in January 1999. I disagree.

Defendants have explained that they did not immediately provide Kiman with a cane in September 1998 because they first needed to verify his need for the cane for both medical and security reasons. As defendants note, a cane can be a dangerous weapon in a prison environment. Thus, prison officials must assess an inmate's need for a cane before it can be dispensed. Defendants also point out that Kiman had little need for a cane while he was in quarantine because he was confined to his cell at all times except for a short daily walk to and from the shower. Under these circumstances, defendants did not violate Title II by taking several days to assess Kiman's condition before they provided him with a cane.

Defendants also were justified in denying Kiman his cane while he was housed in SHU, a high security unit. Although Kiman

was not able to visit the prison yard for outdoor recreation because he didn't have his cane, he was allowed to visit the dayroom for recreation. Kiman cannot point to any other prison program or service that he was unable to participate in because he didn't have a cane. The prison's legitimate security needs therefore justified the DOC's decision to briefly deny Kiman the use of a cane while he was in SHU.

## 2. Request for Early Chow Pass

Defendants' delay in accommodating Kiman's January 6, 1999 request for an "early chow" or "slow movement" pass was similarly justified and reasonable under the circumstances. When Kiman made this request, he was housed in the R&D unit pending administrative review for a disciplinary infraction. Due to heightened security concerns, inmates housed in R&D do not eat their meals at the same time as the rest of the inmate population. Hence, "slow movement" passes are not available to them. Instead, inmates housed in R&D can request what is known as a "cell feed," and eat their meals in their cells. Title II does not require defendants to employ any and all means to accommodate a disability, and the option of a "cell feed" was a

reasonable accommodation available to Kiman, had he requested it. See Cochran, 401 F.3d at 187.

### 3. Request for Front Cuff Pass

Kiman also charges that it was unreasonable for defendants to handcuff him behind his back. The record reveals only one instance in which Kiman was handcuffed behind his back after Bernadette Campbell issued him a front cuff pass shortly after he requested one. The record also reveals that when Kiman submitted an Inmate Request Slip complaining about the incident, corrections officials promptly conducted an investigation. They learned that the reason he had been treated in this manner was that Kiman had not been carrying his front handcuff pass with him at the time. In the prison setting, it is certainly reasonable for the DOC to require inmates to carry passes with them so that corrections officers can quickly and accurately verify that an inmate is entitled to special accommodation.

### 4. Request for a Shower Chair

Kiman also has presented no admissible evidence that corrections officers prevented him from using a shower chair. All he offers is an unsubstantiated allegation on this point.

-33-

Such unsupported assertions are insufficient to raise a genuine issue of material fact.  Instead, the unrebutted evidence demonstrates that Kiman was issued a shower chair after he requested one.  Consequently, I conclude that defendants reasonably accommodated Kiman's request.

5.    **Request for a Bottom Bunk Pass, a First Tier Assignment and Handicap-Equipped Shower**

Kiman finally complains that he was forced to reside on the third tier of the prison, sleep in a top bunk, and use shower facilities that were not specially equipped for handicapped inmates.  Defendants do not dispute that these claims are true.  Instead, they assert that they cannot be held liable for not providing these accommodations because Kiman never requested them.  Defendants are correct.  The orderly operation of the prison requires inmates to communicate their requests to prison staff using Inmate Request Slips.  Prison officials are not required to "anticipate a prisoner's unarticulated need for accommodation or to offer accommodation sua sponte, . . . it is incumbent on the prisoner to request accommodation in the first instance."  Shedlock, 818 N.E.2d at 1034; see also Lue v. Moore,

43 F.3d 1203, 1206 (8th Cir. 1994)(finding no violation of the Rehabilitation Act where blind prisoner did not apply for program or request accommodation).  Kiman has presented no evidence that he submitted either a proper request to be moved from the third tier or a complaint that his bottom bunk pass, issued the day after he returned to prison, was not being honored.  Similarly, there is no record evidence that he ever asked to be housed in a cell equipped with handicapped bathroom and shower facilities.  Absent a specific request for these particular accommodations, I cannot conclude that defendants acted unreasonably in failing to provide them.  See Shedlock, 818 N.E.2d at 1034.  In short, even viewed in the light most favorable to Kiman, the undisputed facts demonstrate that defendants reasonably accommodated his disability.  His Title II claim thus fails.


## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 41) is granted and I decline to exercise supplemental jurisdiction over Kiman's state law claims. Judgment shall be entered for the defendants on Kiman's Title II

-35-

claims and his state law claims shall be dismissed without prejudice.

     SO ORDERED.


_____
Paul Barbadoro
United States District Judge

May 25, 2005

cc:  Nancy Sue Tierney, Esq.
     Mary E. Maloney, Esq.